ESTATE OF Thomas P. QUIRK, Deceased, Gregory J. Quirk, Norman D. Rollins, Co-Administrators, Mary C. Quirk, Petitioners–Appellants (90–1129),

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

John P. LAWLER, Eileen F. Lawler, Michael J. Skelly, Georgette T. Skelly, Karim A. Abood, Donna H. Abood, Felix E. Matusky, Florence P. Matusky, Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant, (90–1183/1185/1186/1187).

Nos. 90–1129, 90–1183, 90–1185, 90–1186 and 90–1187.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1991.

Decided March 25, 1991.

Michel G. Kaplan (argued), J. Lee Woodruff, Steven K. Wood, Boult, Cummings, Conners & Berry, Nashville, Tenn., for Estate of Thomas P. Quirk, Gregory Quirk, and Norman D. Rollins, Co–Administrators.

Joe Vaulx Crockett, III (argued), Nashville, Tenn., for Mary C. Quirk.

Peter K. Scott, I.R.S., Office of Chief Counsel, Washington, D.C., Gary R. Allen, Acting Chief, Robert S. Pomerance (argued), Regina S. Moriarty, Shirley D. Peterson, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for C.I.R.

Eugene Chester (argued), William H. Whitledge, James H. Kenworthy, Everett, Johnson & Breckinridge, New York City, for John P. and Eileen F. Lawler.

Marcia P. Kaplan, Howrey & Simon, Washington, D.C., Eugene Chester (argued), William H. Whitledge, James H. Kenworthy, Everett, Johnson & Breckinridge, New York City, for Michael J. and Georgette T. Skelly.

Eugene Chester (argued), William H. Whitledge, James H. Kenworthy, Everett, Johnson & Breckinridge, New York City, for Karim A. Abood and Donna H. Abood, and Felix E. Matusky and Florence P. Matusky.

Before JONES and NELSON, Circuit Judges, and JOINER, Senior District Judge.[*]

NATHANIEL R. JONES, Circuit Judge.

In this consolidated appeal, petitioners-appellants Estate of Thomas P. Quirk and Mary Quirk appeal the tax court's finding of a tax deficiency for the tax years 1974 and 1975. The Commissioner has filed protective appeals against the tax court's finding of an overpayment to petitioners-appellees John P. Lawler, Felix E. Matusky, Michael J. Skelly and Karim A. Abood.

## I.

The dispute in this case centers on the tax consequences of Thomas Quirk's retirement from Quirk, Lawler & Matusky Engineers ("QLM"), an engineering firm organized as a partnership under New York law. Quirk withdrew from QLM on October 31, 1974. At the time of his withdrawal, his proportional share of the partnership income, assets and liabilities was 30.667%. QLM did not have any written partnership agreement and had no formal provisions for division of assets in the event of the withdrawal of a partner. In anticipation of the resolution of the affairs of QLM, and to determine Quirk's share of the partnership's assets and liabilities at the time of Quirk's withdrawal, QLM engaged Peat, Marwick, Mitchell & Co. ("Peat Marwick"), to prepare a financial statement. According to this statement, QLM's total assets as of October 31, 1974, were $1,790,644.05, including unrealized receivables of $1,601,906; cash and other current assets of $87,355; and net capital assets after depreciation of $101,283.17. Quirk's share of these total assets was $549,136 (30.667% of $1,790,644). According to the statement,

[*] Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

89.45989% of QLM's assets were attributable to unrealized receivables. The financial statement also reflected total liabilities of $1,043,376.41, Quirk's share of which amounted to $319,972 (30.667% of the total). Thus, Quirk's total interest in the partnership amounted to $232,795, derived from Quirk's share of the assets minus his share of QLM's liabilities.

After Quirk's withdrawal from QLM, a new partnership was formed by Lawler, Matusky and Skelly ("LMS").[1] In 1974, QLM's remaining partners gave Quirk $15,975 in cash and relieved him of $135,970 in partnership liabilities. In 1975, the remaining partners paid Quirk $23,370 in cash and relieved Quirk of $184,002 in QLM liabilities. The remaining partners ceased their cash payments to Quirk in April 1975 when it became clear that no withdrawal agreement could be reached between Quirk and the remaining partners.

The remaining partners stipulated that the Peat Marwick statement accurately reflected the assets and liabilities of QLM at the time of Quirk's withdrawal and that the value of Quirk's interest in QLM, $232,795, was the amount reflected in the statement. J. App. at 51. Quirk contended that the fair market value of his interest in QLM was higher than was reflected in the Peat Marwick statement. Based upon this contention, Quirk instituted a lawsuit in the Supreme Court of New York, County of Rockland, for an accounting of QLM's assets in 1977. This lawsuit was unresolved at the time of the tax court's decision, but was subsequently settled. Under the settlement agreement, the value of Quirk's share of QLM was determined to be $232,795, the figure in the Peat Marwick statement, and Quirk was released from any liability to the remaining partners or LMS.

On his joint return filed with his wife, Mary Quirk, in 1974, Quirk reported income of $111,809 from QLM. In 1975, on his separate return, Quirk claimed no income from QLM. Following an audit of those returns, the Commissioner asserted tax deficiencies in the Quirks' 1974 joint return and in Quirk's 1975 separate return. A petition naming Thomas and Mary Quirk as petitioners was filed with the tax court contesting the 1974 deficiency.[2] Quirk, on his own, challenged the 1975 deficiency.[3] The petitions were consolidated and considered together. Pursuant to an opinion filed on June 29, 1988, the tax court entered decisions sustaining income tax deficiencies against the Quirks of $64,998.87 for 1974 and $85,747.27 for 1975.[4] The decisions were entered on October 31, 1989 and this timely appeal followed.

As this case arose out of a challenge by Quirk to the tax consequences of his withdrawal from QLM, the Commissioner determined protective income tax deficiencies against the partners who remained in the partnership after Quirk's withdrawal. These partners, Matusky, Lawler, Skelly and Abood, challenged these deficiencies in tax court and the petitions were consolidated with the challenges by the Quirks. The tax court sustained the Commissioner's principal position, that the tax liability was properly placed upon Quirk, and thus found no tax deficiencies with respect to the remaining partners. The Commissioner timely filed a protective appeal against the tax court's finding of no deficiency on behalf of the former partners.

The main issue before the tax court was whether QLM's cash payments to Quirk, and the remaining partners' satisfaction of Quirk's share of QLM liabilities, were properly characterized as ordinary taxable income or return of partnership basis under 26 U.S.C. § 736.[5] The Quirks conceded be-

---

1. LMS added appellant Karim Abood as a partner on January 1, 1975.

2. Mary Quirk, on appeal, is now asserting that she was named as a co-petitioner in Quirk's 1974 petition without her authorization.

3. Thomas Quirk died during the pendency of the proceedings below and his estate has been substituted as a party.

4. The Commissioner concedes that Mary Quirk was erroneously named as a petitioner in the 1975 decision.

5. Hereinafter, all references to Tax Code Sections will refer to the Internal Revenue Code of 1954 as amended as of the date of the tax year being discussed.

low that the partnership made "distributions" to Quirk during 1974 and 1975 in two forms—cash and deemed distributions resulting from the partnership's discharge of Quirk's share of QLM's outstanding liabilities at the time of his withdrawal. In Quirk's post-trial brief, he stated that "by virtue of the effect of Section 752(b), Quirk should be deemed to have received a money distribution of $135,970 in 1974 and $184,-002 in 1975 as a result of being discharged with respect to his share of partnership liabilities." Trial Brief at 27 (quoted in Quirk's Appellate Brief at 41). These distributions reflected the discharge of QLM liabilities for both a Chemical Bank note and other outstanding liabilities. As to the latter, the Quirks stipulated that "[a]s a result of Quirk's withdrawal from QLM, Quirk's share of the liabilities of QLM, other than the note payable to Chemical Bank, represented distributions to him in 1974 in the amount of $120,636, i.e., 30.667% of $393,376.41 [the total outstanding liabilities of QLM other than the Chemical note]."[6] J. App. at 53. In addition, noting Quirk's post trial brief, the court found that the parties "agree[d]" that Quirk received additional distributions in liquidation of his partnership interest "by virtue of his release from the Chemical Bank note." Id. at 102. The tax court concluded that the total distributions to Quirk from discharge of partnership in-

debtedness equalled $319,970, a sum essentially equivalent to that he admitted having received as distributions "by virtue of the effect of Section 752(b), ... as a result of being discharged of his share of partnership liabilities." Quirk's Trial Brief at 27.[7]

As the tax court found no evidence to refute these stipulations, the dispute focused on whether the distributions generated ordinary income to Quirk, or instead whether the income should be treated as a return of his basis in capital assets of QLM. Section 736 of the Tax Code governs the character (either capital or ordinary) of distributions received by a retiring partner in liquidation of his partnership interest. To the extent that payments equal the fair market value of the retiring partner's capital account, i.e., the fair market value of the partner's interest in tangible partnership assets such as furniture and fixtures, the payments generally are treated as a return of capital by Section 736(b), and any excess over the partner's basis in his capital account will be capital gain. However, under Section 736(a), ordinary income treatment applies to any portion of the liquidating distributions that is attributable to the retiring partner's interest in the partnership's "unrealized receivables," i.e., the accounts evidencing the partnership's right to future payments for its sale of goods or services. This prevents a partner's retirement from serving as an

Section 736 (26 U.S.C.). PAYMENTS TO A RETIRING PARTNER OR DECEASED PARTNER'S SUCCESSOR IN INTEREST.
(a) *Payments Considered as Distributive Share or Guaranteed Payment.*—Payments made in liquidation of the interest of a retiring partner or deceased partner shall, except as provided in subsection (b), be considered—
 1) as a distributive share to the recipient of partnership income if the amount therefore is determined with regard to the income of the partnership, or
 2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership.
(b) *Payments for interest in Partnership.*—
 (1) *General Rule.*—Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary, to be made in ex-

change for the interest of such partner in partnership property, be considered a distribution by the partnership and not as a distributive share or guaranteed payment under section (a).
 (2) *Special Rules.*—For the purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for—
 (A) unrealized receivables of the partnership (as defined in section 751(c)), or
 (B) good will of the partnership except to the extent that the partnership agreement provides for a payment with respect to good will.

6. Quirk challenges this stipulation on appeal.

7. Quirk now contends on appeal that he should not be bound by these stipulations or the tax court's findings as he never received such distributions, or that such distributions should be offset by increased liabilities under a number of new theories not advanced below.

occasion for converting ordinary income into capital gain. Such receivables are deemed "unrealized" because they have yet to be included in the partnership's income at the time of the partner's retirement. *See* 26 U.S.C. § 751(c). A cash basis partnership, such as QLM, does not recognize such earnings for tax purposes until they are collected.

Before the tax court, Quirk contended that the acknowledged distributions from QLM to him were not ordinary income under section 736(a) primarily because the distributions were in exchange for his interest in the capital assets of the partnership. Although the financial statement prepared by Peat Marwick stated that some 90 percent of the partnership's assets at the time of Quirk's withdrawal consisted of unrealized accounts receivable, Quirk contended that this balance sheet did not give an accurate picture of the partnership's actual financial condition.

As stated above, the tax court resolved the dispute in favor of the Commissioner, finding that Quirk had not presented any evidence to suggest that the figures and proportions represented in the Peat Marwick statement and in the stipulations were inaccurate. Accepting those figures, the court found that some 90 percent of QLM's assets were made up of unrealized receivables at the time of withdrawal. Therefore, approximately 90 percent of the distributions to Quirk were attributable to such receivables and should be considered ordinary income. The remainder of the distributions, some 10 percent, was found to be return of capital. As this was the basis of the Commissioner's calculation of Quirk's 1974 and 1975 deficiencies, the court upheld those deficiencies.

Approximately ten months after the tax court rendered its opinion, Quirk filed a petition for reconsideration advancing several new theories for why the decision should be reversed.[8] Essentially, Quirk asserted that QLM's discharge of his share of the partnership liabilities, excluding the

Chemical note, was not a taxable "distribution" to him. Quirk essentially relied on Revenue Ruling 88–77, 1988–2 C.B. 129, which post-dated the tax court's opinion in this case, wherein the Internal Revenue Service determined that accounts payable and accrued expenses of a partnership should not be treated as partnership liabilities for the purposes of Section 752. Rev. Rul. 88–77 revoked an earlier revenue ruling which had reached the opposite conclusion and was relied upon to determine the outcome of this case. *See* Rev.Rul. 60–345, 1960–2 C.B. 211 (finding accounts payable and accrued expenses were liabilities of the partnership for section 752 purposes). By its terms, Rev.Rul. 88–77, relied upon by the Quirks, was limited to tax years on or after its publication date, September 29, 1988. *See* 1988–2 C.B. at 129. Quirk argued in his motion for reconsideration, and argues here on appeal, that despite this express limitation in Rev.Rul. 88–77, the law leading up to that reversal in Internal Revenue policy was extant in 1974 and thus should have been applied.

The tax court denied Quirk's motion for reconsideration, reasoning that the motion raised issues which were not presented before and therefore ran afoul of the court's "long-standing rule against allowing a party a second try at the same case." J. App. at 183–84. The court noted that Quirk could have raised his new arguments before the tax court either at trial or in his post-trial brief and did not. Thus, the court refused to grant the motion for reconsideration without deciding the applicability of the new facts and law to its prior decision. *Id.* at 184.

## II.

■ The overwhelming majority of the numerous issues Quirk raises on appeal were never raised before the trial court. Thus, as a threshold question, we must consider whether Quirk's new arguments challenging the tax court's factual findings and legal conclusions, which are based

---

**8.** This motion for reconsideration was filed out of time, but the tax court granted leave for it to be filed nonetheless.

upon new legal theories not advanced below and upon Quirk's attempt to have us reconsider stipulated facts, are properly before this court. For the reasons set forth below, we find that they are not.

As noted above, the determination of the tax consequences to a retiring partner of the liquidation of his partnership interest is a two-step inquiry. First, the amount of the distributions or payments received by him must be ascertained. It is settled that a partnership's payment or assumption of partnership liabilities outstanding on the date of the retiring partner's withdrawal is treated as the equivalent of a money distribution to the retiring partner under Section 752(b).[9] *See Stilwell v. Commissioner,* 46 T.C. 247, 251 (1966). The second step of the inquiry, once the amounts of the distributions are determined, is whether those distributions constitute ordinary income or return of capital, applying Sections 736(a) and (b).

At trial in the tax court, the dispute centered on the second step of the analysis—namely whether the payments made by QLM to Quirk in liquidation of Quirk's partnership interest constituted ordinary income or return of capital. While the tax court made a factual finding that Quirk did not present any evidence to challenge the Peat Marwick assessment of QLM's assets and liabilities, the first step of the analysis concerning the amounts of the distributions to Quirk was largely a non-issue as those amounts were conceded by the Quirks. Their post-trial brief recited that "by virtue of the effect of Section 752(b), Quirk should be deemed to have received a money distribution of $135,970 in 1974 and $184,002 in 1975 as a result of being discharged with respect to his share of partnership liabilities." Quirk's Appellate Brief at 41 (quoting his post trial brief at 27). The total of

these two figures, $319,972, equalled Quirk's 30.667% share of the total partnership liabilities of QLM as reflected in the balance sheet of the Peat Marwick statement. As noted above, Quirk also stipulated that the discharge of Quirk's portion of the Chemical note represented a distribution to him of $120,636. J.App. at 53.

The fact that Quirk admitted that the payments he received were distributions for section 752(b) purposes was consistent with the theory he advanced at trial that these distributions were not properly characterized as largely representing "unrealized receivables" under section 736(b), but were rather return of capital under 736(a). Thus, the tax court, understanding the parties to have "stipulated" and "agreed" that Quirk had received the distributions in liquidation of his partnership interest, devoted the majority of its opinion to whether these distributions were accounts receivable or return of capital.

On appeal, Quirk asks this court to consider a new argument—basically that QLM's discharge of Quirk's share of its indebtedness did not result in a "distribution" to Quirk at all. Quirk suggests several new theories for this conclusion, only one of which he raised before in his motion for reconsideration. None of the other new theories advanced was ever before the tax court in any form. As noted, the tax court refused to reconsider its prior decision because Quirk had not raised any of his new contentions at trial or in his post-trial brief and the tax court was not going to give him a second chance to litigate his case.

The Commissioner suggests that this court should respond to Quirk's new arguments in the same fashion. It is well-settled that, absent exceptional circumstances,

---

**9.** Section 752 (26 U.S.C.) *TREATMENT OF CERTAIN LIABILITIES.*

(a) *Increase in partner's liabilities.*

Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) *Decrease in partner's liabilities.*

Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

a court of appeals will not consider an argument by an appellant that was not presented to or considered by the trial court. *See Sigmon Fuel Co. v. Tennessee Valley Auth.*, 754 F.2d 162, 164–65 (6th Cir.1985) ("In the interests of judicial economy and the finality of judgments, and mindful of our role as an appellate court, we have declined to review arguments not presented to the district court in the first instance."); *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1164 (6th Cir.1988). The rationale behind this rule was recently elaborated by the Tenth Circuit in *Anschutz Land & Livestock Co. v. Union Pacific Railroad Co.*, 820 F.2d 338, 344 n. 5 (10th Cir.), *cert. denied sub nom., Joseph Fawcett & Sons, Inc. v. Union Pacific Railroad Co.*, 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987):

> Propounding new arguments on appeal in attempting to prompt us to reverse the trial court—arguments never considered by the trial court—is not only somewhat devious, it undermines important judicial values. The rule disciplines and preserves the respective functions of the trial and appellate courts. If the rule were otherwise, we would be usurping the role of the first-level trial court with respect to the newly raised issue rather than reviewing the trial court's actions. By thus obliterating any application of a standard of review, which may be more stringent than a *de novo* consideration of the issue, the parties could affect their chances of victory merely by calculating at which level to better pursue their theory. Moreover, the opposing party would be effectively denied appellate review of the newly addressed issue, save in the rare instances of Supreme Court review. In order to preserve the integrity of the appellate structure, we should not be considered a "second shot" forum, a forum where secondary, back-up theories may be mounted for the first time.

Quirk makes two assertions as to why this court should consider his new legal theories for the first time on appeal. The first is that these are not "new" theories because they involve the same statutory scheme: the application of sections 736 and 752 to Quirk's retirement income. *Cf. Ralph Shrader, Inc. v. Diamond Int'l. Corp.*, 833 F.2d 1210, 1213–14 (6th Cir. 1987) (on the facts before it, the court exercised its discretion to hear issue on appeal which was not raised below because issue involved the same "statutory scheme"). The Commissioner responds that Quirk had ample opportunity to raise alternative theories below at trial and did not do so. Quirk did not in his motion for reconsideration nor does he here on appeal assert any reason why such issues were not raised below. Further, the arguments advanced by Quirk on appeal are in exact contradiction to concessions made by Quirk at the trial level as to the fact of his receiving distributions. This court has often held that if a litigant proceeds on one theory at trial, he cannot later reverse himself and pursue another theory on appeal. *See, e.g. Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 343 (6th Cir.1984); *Holden v. Owens–Illinois, Inc.* 793 F.2d 745, 754 (6th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986) (citing *Ghandi*).

■ Quirk's second contention as to why we should hear his new theories is that he should not be bound by his stipulations as to having received distributions in liquidation of his partnership interest in 1974 and 1975 because the amount he received as a distribution for tax purposes was a question of law as well as fact. He cites a number of cases suggesting that a reviewing court need not be bound by "stipulations of law" made by the parties below. *See, e.g. Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917) (court cannot be controlled by the agreement of counsel as to a subsidiary question of law).

■ The Commissioner points out that the Tax Court Rules of Practice and Procedure admonish litigants in that court that their stipulations generally will be treated as binding and conclusive.[10] Normally,

---

10. Rule 91(e) of the Tax Court Rules provides:

(e) *Binding effect.* A stipulation shall be treated, to the extent of its terms, as a conclu-

when a party wants to waive an argument or issue that might otherwise be litigated, the waiver can be accomplished by a stipulation which narrows the dispute. In fact, narrowing disputes to the essential disputed issues is the primary function of stipulations. It would seem that if parties could challenge their prior stipulations at will, stipulations would lose much of their purpose. In this case, Quirk does not raise any exceptional circumstances for why he and his wife should be permitted to rescind their previously asserted legal and factual positions at trial for the first time on appeal.

■ Finally, we must consider whether the issue raised by Quirk for the first time in his motion to reconsider should be heard by this court. As the tax court correctly pointed out in its order denying reconsideration: "The granting of a motion for reconsideration rests within the discretion of the [Tax] Court and will not be granted unless unusual circumstances or substantial error is shown." J. App. at 183 (citations omitted). It would seem the court acted within its discretion in declining to reopen the case. The motion, in essence, relied on Rev.Rul. 88–77, 1988–2 C.B. 129, which reversed the Internal Revenue Service's prior treatment of accounts payable and accrued expenses under Section 752, finding that they are not liabilities. Thus, on reconsideration, Quirk sought to have the portions of his distributions which were based upon accounts payable and accrued expenses, deducted from his tax liability. However, the ruling by its terms, was limited to tax years after 1988. Quirk sought to get around this non-retroactive holding by asserting that the relevant law on which this reversal of policy was based was extant in 1974 and therefore should have applied. However, the governing law for the relevant time period involved in this suit was Rev.Rul. 60–345, 1960–2 C.B. 211. Rev. Rul. 60–345 held that accounts payable and accrued expenses are treated as "liabilities" within the meaning of Section 752.

This is the law that the tax court applied in its decision. While the tax court did not decide the relevancy of the new law cited by Quirk on reconsideration, aside from noting its non-retroactive nature, we find the court was not in error in refusing to reconsider Quirk's case based upon new theories not advanced at trial.

### III.

■ Having disposed of the issues we will not consider, we proceed to the issues which Quirk properly did preserve for appeal. We note that the Commissioner's determination of a deficiency is presumptively correct, *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933), and the burden is on the challenging party to establish reversible error. Tax Court Rule 142(a). We review the findings of the tax court on a clearly erroneous standard. *Commissioner v. Duberstein*, 363 U.S. 278, 290–91, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218 (1960).

■ Quirk's first contention is that the tax court erred in treating the distributions received by Quirk as "payment in liquidation of the interest of a retiring partner" for the purposes of Section 736 because under New York law he remained a partner in QLM after his retirement date. Quirk makes reference to Treas.Reg. 1.736–1(a)(ii) (1990) which states that a partner retires for the purposes of the regulations, when he ceases to be a partner under local law. He further cites regulation 1.761–1(d), which defines "liquidation of a partner's interest" as follows:

(d) Liquidation of partner's interest. The term "liquidation of a partner's interest" means the termination of a partner's entire interest in a partnership by means of a distribution, or series of distributions, to a partner by the partnership. A series of distributions will come within the meaning of this term whether they are made in one year or in more

---

sive admission by the parties to the stipulation, unless otherwise permitted by the court or agreed upon by the parties. The Court will not permit a party to a stipulation to qualify,

change or contradict a stipulation in whole or in part, except that it may do so where justice requires.

than one year. Where a partner's interest is to be liquidated by a series of distributions, the interest will not be considered as liquidated until the final distribution has been made ... A distribution which is not in liquidation of a partner's entire interest, as defined in this paragraph, is a current distribution. Current distributions, therefore, include distributions in partial liquidation of a partner's interest, and distributions of the partner's distributive share.

Treas.Reg. § 1.761–1(d) (1990). Quirk asserts that the distributions in 1974 and 1975 could not have been "payments in liquidation of the interest of a retiring partner" because under New York law he remained a partner until his state court action against QLM was resolved in 1985.

 The tax court found that Quirk was no longer a partner under New York law, without citing any authority. J.App. at 99 n. 9. Quirk asserts that under New York law a partnership is not terminated until the "winding up of the partnership affairs are completed." N.Y. Partnership Law § 61 (McKinney 1988). However, we find Quirk has misinterpreted New York law. In New York State, a partnership is dissolved when the partner withdraws. N.Y. Partnership Law §§ 60, 62, subd. 1(b) (McKinney 1988). The withdrawing partner no longer shares in the gains and losses of any continuing entity and his actions cannot bind the continuing partnership or its partners. *Id.* § 64; *Matter of Silverberg*, 81 A.D.2d 640, 438 N.Y.S.2d 143 (2d Dep't, 1981). It is uncontested that Quirk ceased to share in the income or liabilities of the partnership after his withdrawal date on October 31, 1974.

The issue of when a partner ceases to be a partner under state law for the purposes of Section 736 has been addressed on several occasions. *See, e.g. Milliken v. Commissioner*, 72 T.C. 256, 262 (1979), *aff'd in an unpublished opinion*, (1st Cir.1979) (tax court applied Section 736 to distributions made in taxable year partner was expelled from partnership, even though partner's interest was not completely liquidated in that year); *Holman v. Commis-*

*sioner*, 66 T.C. 809 (1976), *aff'd*, 564 F.2d 283 (9th Cir.1977). *Holman* involved a situation analogous to the situation presented in this case. In *Holman*, several expelled partners contested their expulsion from the partnership in state court. Consequently, the partners' status with the partnership and the amounts due them from the partnership were not settled until the state court litigation was settled five years after the expulsion. 66 T.C. at 812. Despite the ongoing litigation, the tax court in *Holman* applied Section 736 to distributions made in the year the partners were expelled. The lesson from *Holman* and *Milliken* is that a partner ceases to be a partner under local law for Section 736 purposes when that partner ceases to share in the ongoing business of the partnership, rather than in the last year of the liquidation of his interest, as Quirk suggests.

In this case, the court found that Quirk ceased to be a partner as of his withdrawal date. The court further found that since Quirk's share of QLM's assets was not being calculated based upon income from the ongoing partnership, it was a "guaranteed payment," and that the amount was "fixed" because it was calculated on a set percentage of QLM's assets. While there was some dispute over whether Quirk's share was larger than the stipulated minimum, the court found that Quirk did not present any evidence to suggest that the figures represented in the Peat Marwick statement did not accurately reflect his share of the partnership and the partnership's assets and liabilities. Thus, the court found that the distributions made to Quirk after the withdrawal date were payments made in liquidation of a partner's interest in the partnership for the purposes of Section 736. We agree.

To hold otherwise would be contrary to *Holman* and *Milliken*, and would undermine the purpose of Section 736, which is to give some certainty and finality to tax calculations when a partner retires from a partnership. Under Quirk's theory, any retiring partner who did not want to pay taxes on deemed distributions would simply institute a suit alleging that the partnership owes him more than he was going to

receive. By so doing, the partner could delay his tax liability and unsettle the tax liability of the partnership for many years while his litigation is proceeding. In Quirk's case, his New York litigation was not settled until 1985, over ten years after he withdrew from QLM. For these reasons, we agree that the distributions made to Quirk in 1974 and 1975 were "payments in liquidation of the interest of a retiring partner" within the meaning of Section 736.

▉ Quirk finally argues that because his state court action was brought to determine the value of his interest in QLM, the state court might have determined that his interest in QLM involved a different percentage of unrealized receivables and capital contributions. Since the state court case had not been decided at the time this case was brought before the tax court, Quirk argues the tax court should not have determined the fixed percentage of receivables and capital contribution. However, this was the only real question before the tax court. Quirk did not put on any evidence which suggested that the Peat Marwick statement did not accurately reflect the ratio of receivables to other assets. Further, as noted above, under Quirk's theory, a taxpayer could avoid a tax assessment under Section 736 for many years by simply filing a lawsuit challenging the partner's share. Therefore, we find that the tax court's determination, based upon the Peat Marwick statement, that 89.4989% of Quirk's distributions represented unrealized receivables, and thus ordinary income for his tax purposes, was not clearly erroneous.

### IV.

▉ Mary Quirk has raised several issues on appeal independent of those issues raised on her behalf by Quirk's estate. Thus, we address those issues separately. Mary Quirk's first contention is that she never authorized counsel to file a joint petition with Quirk challenging the tax deficiency attributed to her and Quirk as a result of their joint tax return in 1974. She alleges that she did not even know about the tax court proceeding until recently when she was informed by Quirk's estate. She has attached to her brief a letter from the lawyer who filed the petition and other documents which are not part of the record. The Commissioner does not object to a remand for the limited purpose of allowing the tax court to consider this contention. If Mary Quirk did not authorize or ratify the decision to file the petition, the tax court could remove her name from its decision determining a tax deficiency for 1974 on the ground that it did not have jurisdiction over her. *See Abeles v. Commissioner*, 90 T.C. 103, 108–09 (1988) (judgment entered against party without jurisdiction over that party is void). We therefore remand the tax court's finding of a deficiency as to Mary Quirk in 1974 for this limited purpose.

▉ In the alternative, and implicitly acknowledging her acquiescence in the joint petition, Mary Quirk argues that she should be relieved from the 1974 tax deficiency because, (1) the notice of tax deficiency was not timely mailed, and (2) that she is excused from tax liability as an "innocent spouse."

Mary Quirk first asserts that the Commissioner mailed the notice of tax deficiency out of time, and that the tax court therefore should not have sustained any part of deficiency. The Commissioner asserts that this argument was never raised below and was therefore waived. Rule 39 of the Tax Court's Rules states that "[a] party shall set forth in his pleading any matter constituting an avoidance or an affirmative defense, including * * * the statute of limitations." A taxpayer who fails to plead and preserve a statute of limitations defense in tax court cannot assert it for the first time on appeal. *See Reeves v. Commissioner*, 314 F.2d 438, 439 (6th Cir. 1963). Because neither Mary nor Thomas Quirk ever raised the issue of the timeliness of the notice of deficiency before, the record does not reflect when the Quirks' tax return was filed and thus when the statute of limitations began to run. Nor does the record reflect whether the normal limitations period was extended by agree-

ment between the taxpayers and the IRS. We find this issue was not raised below in the Quirks' pleadings and cannot be raised for the first time on appeal.

■■■■■ Mary Quirk's second contention is that she qualifies as an innocent spouse under Section 6013(e). Generally, since a married couple who files a joint return gets a lower tax rate applied than if the spouses filed separately, the spouses are held jointly and severally liable for the full amount due on their combined incomes, even though one spouse may have earned more than the other. *See* 26 U.S.C. § 6013(d)(3). However, a spouse who qualifies as an innocent spouse under section 6013(e) may avoid joint liability for taxes due on a joint return. A determination of whether a spouse qualifies as an innocent spouse is primarily a factual inquiry. *See, e.g. Shea v. Commissioner,* 780 F.2d 561, 565 (6th Cir.1986); *Purcell v. Commissioner,* 826 F.2d 470, 473 (6th Cir.1987), *cert. denied,* 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988). Mary Quirk did not raise this defense below and the proper factual record was therefore not developed. Further, assuming that Mary Quirk authorized counsel to file the joint petition, failure to raise the innocent spouse defense at trial is wholly unexcused, and this court will not address it for the first time on appeal.

■■■■■ Finally, Mary Quirk asserts that she was not a party to the petition challenging Thomas Quirk's 1975 individual tax return and that she was mistakenly included on the caption of the tax court's order, resulting in her liability for that deficiency. The Commissioner concedes that Mary Quirk was erroneously included on the caption of the tax court's judgment for 1975. Therefore, we remand this portion of the tax court's judgment so that Mary Quirk's name can be removed from the caption.

In sum, then, we remand the tax court's finding of a deficiency as to Mary Quirk for 1974 for the sole purpose of considering whether she was included on Quirk's petition without her consent. In addition, we remand so that Mary Quirk's name can be removed from the tax court's finding of a deficiency for 1975.

V.

For the aforementioned reasons, we AFFIRM the tax court's finding of deficiencies for 1974 and 1975 as to appellant Estate of Thomas Quirk. With respect to Mary Quirk and the remaining partners, we REMAND to the tax court for further proceedings consistent with this opinion.