**William A. ISAAK; Lola J. Isaak; Edmond M. Gray; Judith Gray, on behalf of themselves and other persons similarly situated, Plaintiffs–Appellants,**

v.

**TRUMBULL SAVINGS & LOAN COMPANY, Defendant–Appellee.**

**John F. McDonagh and Virginia McDonagh, on behalf of themselves and other persons similarly situated, Plaintiffs–Appellants,**

v.

**Cortland Savings and Banking Company, Defendant–Appellee,**

**Geico Financial Services, Inc., Defendant.**

**Frank Slentz; Lois Slentz; Melody Brammer, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**Cortland Savings and Banking Company, Defendant–Appellee.**

Nos. 97–4347, 97–4349 and 97–4350.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1998.

Decided March 2, 1999.

**392**

Michael P. Malakoff, James M. Pietz (argued and briefed), Malakoff, Doyle & Finberg, Pittsburgh, Pennsylvania, for Plaintiffs–Appellants.

Kevin P. Murphy (argued and briefed), Michael G. Marnado, Harrington, Hoppe & Mitchell, Warren, Ohio, for Defendant–Appellee Trumbull Savings & Loan in No. 97–4347.

Michael L. Robinson (argued and briefed), Robinson & Associates, Akron, Ohio, for Defendants–Appellees Geico Financial Service, Inc., Cortland Savings and Banking Company in No. 97–4349.

Robert M. Platt, Gessner, Platt & Dull, Warren, Ohio, Michael L. Robinson (argued and briefed), Robinson and Associates, for Defendant–Appellee Cortland Savings and Banking Company in No. 97–4350.

Before: SUHRHEINRICH, CLAY, and GILMAN, Circuit Judges.

CLAY, Circuit Judge.

Class Plaintiffs in these three consolidated actions appeal from the district court's order dismissing with prejudice Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, claims against the defendant banks on statute of limitations grounds, and dismissing without prejudice Plaintiffs' pendent state law breach of contract claims. Plaintiffs constitute thousands of individuals who purchased and obtained installment loan financing for interests in two "to be developed" timeshare resorts in northern Ohio: Ponderosa Park and The Landing at Clay's Park (collectively, the "Campgrounds"). Defendants are banks that entered into an agreement with the owners and developers of these resorts to provide on-site installment loans for individuals seeking to purchase interests in the resorts.

The district court found Plaintiffs' claims barred by RICO's four-year statute of limitations. On appeal, Plaintiffs argue: (i) that the district court improperly found that Plaintiffs had standing to bring a RICO cause of action as early as October 1988, when the Campgrounds filed for bankruptcy; and (ii) that the district court wrongly held that Plaintiffs discovered, or reasonably should have discovered, the source and existence of their injuries and a "pattern" for RICO purposes more than four years before the first complaint was filed on May 25, 1993. We AFFIRM the district court's grant of summary judgment for the reasons set forth below.

**I.**

**A.** *Procedural Background*

In 1993, Plaintiffs filed three class action complaints against Trumbull Savings and Loan Company ("Trumbull"), Cortland Savings and Banking Company ("Cortland") and GEICO Financial Services, Inc. ("GEICO"), alleging civil violations of RICO.[1] Plaintiffs in

---

1. The three actions are as follows: *Isaak v. Trumbull Sav. & Loan Co.*, 4:93 CV1121 (N.D.Ohio) (filed May 25, 1993); *McDonagh v. GEICO Fin. Serv., Inc. and Cortland Sav. & Bank-* *ing Co.*, 4:93 CV 1352 (N.D.Ohio) (filed June 25, 1993); and *Slentz v. Cortland Sav. & Banking Co.*, 4:93 CV 1480 (N.D.Ohio) (filed July 16,

these actions are represented by nine class representatives. Each representative was invited through the use of the wires or mails to tour the "to be developed" Campgrounds in 1986, 1987 or 1988, and purchased an interest in the Campgrounds on the day of the tour by executing a form contract entitled "Agreement For Deed." In addition, each representative agreed to obtain installment loan financing being offered on-site through the defendant banks pursuant to installment loan contracts that were executed simultaneously with the purchase contracts.

In their complaints, Plaintiffs allege that the owners and operators of the Campgrounds, known as the LiVorio–Sabatini Group, engaged in a pattern of racketeering that injured Plaintiffs' property interests in the Campgrounds, in violation of RICO. The complaints allege that the banks were liable in damages to Plaintiffs for participating in and conspiring in the LiVorio–Sabatini Group's RICO violations.

After the close of discovery, the banks filed motions for summary judgment on all claims. In relevant part, the banks argued that Plaintiffs' RICO claims were time-barred under the applicable four-year statute of limitations. The district court agreed and issued an order dismissing the RICO claims. First, the district court held that Plaintiffs' RICO injuries were ascertainable and definable at the time Campgrounds filed for bankruptcy in October 1988. Second, the district court found that Plaintiffs had, or reasonably should have, discovered the existence and source of their injuries and the "pattern" for RICO purposes more than four years before the complaints were filed in 1993. Accordingly, the court dismissed with prejudice Plaintiffs' federal RICO claims and dismissed without prejudice their state law claims for lack of supplemental jurisdiction. This appeal followed.

## B. *Factual Background*

The parties do not dispute the basic facts regarding the LiVorio–Sabatini Group's fraudulent "bust-out" scheme.[2] Plaintiffs generally paid from $4,000 to $6,000 apiece for the purchase of an undivided 1/750th interest in one phase of the Campgrounds. Each phase was an undeveloped, six-acre plot of land, and the overall property in which each plaintiff had an interest was described by metes and bounds in the Agreement For Deed entered into between Plaintiffs and the Campgrounds. Each Agreement For Deed promised that the "to be developed" Campgrounds would be a fully developed year-round timeshare campground operation. Upon payment of the total purchase price, the Campgrounds were required to deliver a warranty deed conveying title to Plaintiffs. The Agreements For Deed also required an annual fee for the maintenance and operation of the recreational facilities owned by the Campgrounds.

After the Group had partially developed the Campgrounds and obtained millions of dollars in purchase money loan proceeds and other membership sales proceeds, the Group then looted the Campgrounds of all capital necessary to complete and operate the Campgrounds. After only three years, the Campgrounds became insolvent and were placed into bankruptcy.

### 1. *1985–86: LiVorio–Sabatini Group commences "bust-out" scheme*

In 1985, the LiVorio–Sabatini Group obtained from Bank One of Youngstown (Ohio) ("Bank One") commercial financing for the purchase and development of the Campgrounds. Bank One and the LiVorio–Sabatini Group devised an installment financing plan to sell undivided interests in the Campgrounds. Following a tour of the Campgrounds, interested purchasers executed sales agreements (the Agreements For Deed) and installment financing contracts.

1993). These class actions were consolidated by the district court below.

**2.** In one version of a fraudulent bankruptcy "bust-out" scheme, the perpetrators create a seemingly legitimate business with the goal of amassing assets by attracting investors, taking out loans, or purchasing merchandise on credit. However, rather then investing in the company, the perpetrators instead divert assets for their personal gain before allowing the company to fall into bankruptcy. *See United States v. Demetre,* 461 F.2d 971 (6th Cir.1972).

The resulting loan proceeds were then disbursed among the Group's account and Bank One's reserve accounts. Huge profits followed.

In order to execute the "bust-out" scheme, the Group first needed an influx of financing and an appearance of credit-worthiness. The Group obtained both by bribing two Bank One officials. After these officials touted the Campgrounds to their superiors, the Group received substantial commercial loans and an on-site installment loan facility through Bank One. The ensuing sales of interests in the Campgrounds helped further create the appearance of credit-worthiness and provided a quick infusion of cash into the business. The LiVorio–Sabatini Group was then able to proceed with its bust-out scheme. Once the Group obtained Plaintiffs' money "up-front" as a result of financing obtained by Plaintiffs, it diverted the money from the Campgrounds. In 1985 and 1986, the Campgrounds generated more than $12 million in sales through the use of Bank One's on-site installment loan program. The Campgrounds were under construction at this time.

However, in 1986, senior Bank One officials uncovered the fraud, finding that the LiVorio–Sabatini Group was draining the company. In July 1986, Bank One canceled its loan relationship with the Group, thus imperiling the continuation of the bust-out scheme.

### 2. 1986–87: Group obtains financing from Trumbull, Cortland and GEICO

After Bank One canceled its financing agreement, in August 1986 the Group approached Trumbull seeking another lender to finance the Campgrounds interests. Plaintiffs allege that Trumbull agreed to finance an installment loan program even though it knew that the LiVorio–Sabatini Group could not guarantee the repayment of these loans. Plaintiffs claim that the deal structure effectively operated to provide Trumbull with "kickbacks" because Trumbull knew that the Group was unable to repurchase or guarantee the loans. According to Plaintiffs, Trumbull and the LiVorio–Sabatini Group structured the deal to enhance Trumbull's ability to enforce and collect on the installment loans once the Campgrounds were bankrupt.

In 1987, the Campgrounds began experiencing serious financial problems and had difficulty paying off its debts. As a result, the LiVorio–Sabatini Group approached Cortland for additional financing. Cortland agreed to finance an installment loan program under an arrangement similar to Trumbull's. Again, Plaintiffs allege that the deal structure effectively operated to provide Cortland with "kickbacks" because Cortland knew that the Group would be unable to repay the loans.

The LiVorio–Sabatini Group continued to drain money from the Campgrounds after obtaining financing from Trumbull and Cortland. In addition, GEICO purchased Bank One's portfolio of Campground installment loans in 1987, and also began making on-site installment loans at the Campgrounds in 1987 and 1988.

### 3. 1988: Mounting problems culminate in bankruptcy

In March 1988, the Ohio Attorney General ("OAG") brought separate lawsuits that alleged that the LiVorio–Sabatini Group was using deceptive sales practices in violation of state law, such as bait advertising and high-pressure sales tactics. The lawsuits were the subject of newspaper articles that Plaintiffs have acknowledged reading. In addition, numerous members of Plaintiffs' class sought legal counsel and/or initiated their own independent civil legal actions against the Campgrounds, some raising claims of civil RICO violations in August of 1988. In addition, some class representatives complained to the OAG's office about misrepresentations and the Campgrounds' sales practices. On July 8, 1988, the Campgrounds settled these lawsuits by agreeing to reform their sales practices, including agreements to ensure the actual delivery of free prizes, the resale of interests of certain purchasers, the right to rescind to others and a three-day cancellation period.

On October 5, 1988, Ponderosa Park and The Landing each filed for bankruptcy under Chapter 11 of the Bankruptcy Code. In No-

vember 1988, the bankruptcy court appointed a trustee at the banks' request. The trustee began operating the Campgrounds on an interim basis with funding provided by the banks.

#### 4. *January–August 1989: Federal investigation and indictments*

In January 1989, federal law enforcement agents seized all available records of the Campgrounds and related corporations. The seizure was part of a widespread investigation into the illegal activities of the LiVorio–Sabatini Group, the corrupt Bank One officials, and others.

On August 14, 1989, William LiVorio, the Group's head, was indicted for violations of 18 U.S.C. § 1344 (scheme to defraud a bank) and 26 U.S.C. § 7206(1) (income tax evasion). Significantly, the indictment charged LiVorio with: (i) drawing cash receipts from Ponderosa Park Music, Inc.; (ii) making disguised payments for his own benefit; and (iii) paying himself huge profit and salary distributions despite the Campgrounds' declining financial condition and the mounting indebtedness to Bank One. LiVorio pleaded guilty on September 6, 1989.

#### 5. *1991: The trustee liquidates the Campgrounds' assets*

In February 1991, the trustee concluded that it could no longer keep the Campgrounds in operation. Because attempts to recover wrongfully diverted assets proved unsuccessful, the trustee, recognizing that the Campgrounds lacked sufficient funds to continue, moved to liquidate. The Reorganization Plans and Disclosure Statements (the "Disclosures") mailed to creditors (including Plaintiffs) indicated that the Campgrounds' contractual obligations in the Agreements For Deed would not be honored. The Disclosures stated that an appraisal of the Campgrounds' operations had concluded that the only economically feasible plan would be to liquidate the assets to eliminate the Campgrounds' high debt obligations by selling the property to a new operator. A group of affiliated companies was then found to purchase the assets.

In April 1991, the plans were confirmed and the Campgrounds discharged. In May, June and July of 1993, Plaintiffs filed the three class actions now on appeal.

### II.

We review the district court's grant of summary judgment *de novo*. *See Herman Miller, Inc. v. Travelers Indem. Co.*, 162 F.3d 454, 455 (6th Cir.1998). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). We view the facts and all inferences drawn from the facts in the light most favorable to the non-moving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Section 1964(c) provides that a private party injured in his business or property as a result of a RICO violation may obtain a civil remedy in the form of treble damages. The district court held that the injury to Plaintiffs' property was "ascertainable and definable" at the time Campgrounds filed for bankruptcy in October 1988, and, therefore, Plaintiffs attained standing to sue at that time. Plaintiffs, on the other hand, claim that they did not have standing to sue until completion of the bankruptcy proceedings in 1991, when the trustee finally liquidated the Campgrounds' assets, thus causing the actual default of Plaintiffs' contracts with the Campgrounds.

On appeal, Plaintiffs do not dispute the district court's holding that "a pending bankruptcy proceeding does not act to prevent the accrual of a RICO cause of action when the injury caused by the alleged RICO viola-

tion is ascertainable and definable prior to or at the filing of a bankruptcy petition." (J.A. at 311.) However, Plaintiffs attempt to circumvent this holding by arguing that they suffered no injury until completion of the bankruptcy proceedings. Plaintiffs' argument is premised on a narrow view of their property interest for RICO purposes. Plaintiffs contend that "injury to property" occurs only when the racketeering activity causes the default of a contractual performance or deprives one of a right of action on a contract. *See, e.g., Cruden v. Bank of New York,* 957 F.2d 961, 977–78 (2d Cir.1992) (holding that plaintiff debenture holders who alleged fraudulent acts by the issuer had no RICO claim before default on loan contract, since up until that time the possibility of damages was speculative).

Accordingly, Plaintiffs maintain that the only "injury to property" alleged is the breach of their "Agreement For Deed" contractual rights: in other words, the Campgrounds' failure to provide "fully developed" year-round timeshare Campgrounds as promised.[3] Plaintiffs claim that in October 1988, the racketeering activity (the secret diversion of assets contrary to the contractual promise to develop and operate a year-round campground) had yet to defeat this contractual obligation. However, in Plaintiffs' view, upon completion of the bankruptcy proceedings in 1991, it was finally demonstrated that their contractual rights to a "fully developed year round timeshare campground" would not be realized, thus causing injury to their property.

### A.

■ We believe that Plaintiffs' narrow interpretation of the injury suffered is not supported by the record or by applicable state law principles of injury to property, and instead agree with the district court that Plaintiffs' injuries were ascertainable and definable by the time the Campgrounds filed for bankruptcy in October 1988. Plaintiffs themselves alleged that the ultimate goal of the LiVorio–Sabatini Group's "bust-out" scheme was to force the Campgrounds into bankruptcy after looting the working capital, and that the Group never intended to fulfill its contractual obligations. During discovery, Plaintiffs adopted the following definition of a "bust-out" scheme, as set forth in *United States v. Tashjian,* 660 F.2d 829, 832 n. 6 (1st Cir.1981) (citing *United States v. Crockett,* 534 F.2d 589, 592 (5th Cir.1976)):

> A bust out begins with the formation by the malefactors of a seemingly legitimate wholesale business. The fledgling business's first goal is to establish a favorable credit rating. This task is accomplished by a number of devices which can include temporarily putting cash into the business in order to create a strong balance sheet, bribing credit rating agencies, and inflating financial statements so as to vastly overstate the business's assets and net worth. Also, bills for the company's initial purchases are promptly paid—thus furthering the deception through enhancement of the company's credit standing. As the business becomes more established, its promoters order considerable amounts of additional merchandise although they have no intention of paying for these goods. A huge inventory, most of it not paid for, is built up. The principals then busy themselves disposing of their purchases at substantial discounts or secreting the unsold portion for later below-cost covert sales. In other words, they "bust-out" the business. The company is then petitioned into bankruptcy with the mulcted creditors left

---

**3.** This represents a shift from Plaintiffs' position before the district court, where Plaintiffs claimed damages in the form of down payments and subsequent interest payments, and argued that they did not have standing to assert their RICO claims until the conclusion of the bankruptcy proceedings because the *amount* of their damages was still speculative due to the possibility of a partial recovery. "Propounding new arguments on appeal in attempting to prompt us to reverse the trial court—arguments never considered by the trial court—is not only somewhat devious, it undermines important judicial values.... In order to preserve the integrity of the appellate structure, we should not be considered a 'second shot' forum, a forum where secondary, back-up theories may be minted for the first time." *Estate of Quirk v. Commissioner of Internal Revenue,* 928 F.2d 751, 758 (6th Cir.1991). While Plaintiffs may be deemed to have waived arguments not presented to the district court, as seen below, we also reject Plaintiffs' argument on the merits. *See Signon Fuel Co. v. Tennessee Valley Auth.,* 754 F.2d 162 (6th Cir.1985).

to pick over the meatless carcass of an assetless enterprise.

(J.A. at 3211–12.)

■ By Plaintiffs' very definition of the "bust-out" scheme, the fraud was complete when the Campgrounds were placed into bankruptcy in October 1988: this was the final fraudulent act committed by the LiVorio–Sabatini Group in the course of their RICO violations. "When a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors have standing." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 30 F.3d 289, 293 (2d Cir.1994) (holding that the plaintiff creditor of a debtor corporation looted by the defendants had standing to sue under RICO once the looting was complete, even though the debtor corporation had not filed for bankruptcy).

Here, the class action complaints state that Plaintiffs seek to recover the money each plaintiff paid as a down payment for a campground interest, plus the amount of installment payments made thereafter. These expenses were incurred upon a plaintiff's purchase of an undivided interest in the Campgrounds, and constitute injuries suffered by Plaintiffs as a result of the LiVorio–Sabatini Group's fraudulent scheme. Accordingly, Plaintiffs had suffered injury to their property once the scheme was completed and the Campgrounds filed for bankruptcy with combined assets of $8,976,000 and liabilities of $36,708,000. The possibility that Plaintiffs might have been able to recover some of the damages during the course of the bankruptcy proceedings does not negate the existence of injury at the time of the bankruptcy filing. *See Grimmett v. Brown*, 75 F.3d 506 (9th Cir.1996), *cert. granted*, 518 U.S. 1003, 116 S.Ct. 2521, 135 L.Ed.2d 1046 (1996), *cert. denied as improvidently granted*, 519 U.S. 233, 117 S.Ct. 759, 136 L.Ed.2d 674 (1997) (holding that the plaintiff's ability potentially to recoup some of her incurred damages in a bankruptcy proceeding did not

preclude her from bringing a RICO claim where her injuries were definable and ascertainable at the onset of the bankruptcy proceedings).

**B.**

■ Moreover, in addition to this monetary damage, Plaintiffs also suffered injury to their property interests in the Campgrounds themselves. "Injury to property" for RICO purposes is generally determined by state law. *See, e.g., DeMauro v. DeMauro*, 115 F.3d 94, 96 (1st Cir.1997). Under Ohio law, Plaintiffs entered into a contract to purchase an interest in real estate rather than for personal services or membership in a club or organization. *See Kovach v. Erie Islands Resort & Marina*, 93 Ohio App.3d 11, 637 N.E.2d 382 (1994) (holding that the sale of a 1/15,000th interest in real estate consisting of a campground and other resort and recreational facilities constituted a sale of real estate).[4]

■ Ohio law defines a property interest as, among other things, the right to use, enjoy or dispose of land or chattels: "Property is not merely the ownership and possession of land or chattels. It also embraces the unrestricted right to use, enjoy and dispose of lands or chattels. Anything [that] destroys any of these elements of property, to that extent destroys the property itself." 16 Ohio Jur.3d *Constitutional Law* § 483 (1979). The record here indicates that the LiVorio–Sabatini Group's RICO violations caused Plaintiffs to suffer injury both to their use and enjoyment of the Campgrounds property and to their ability to dispose of or transfer the property. These injuries to Plaintiffs' property interests in the Campgrounds occurred well before bankruptcy filing in October 1988.

**1. *Injury to Plaintiffs' use and enjoyment of the campground resorts***

Each "Agreement For Deed" guaranteed Plaintiffs exclusive use of a campsite

---

**4.** Other jurisdictions similarly consider the sale of time shares to be a sale of real estate. *See, e.g., Modern Realty of Missouri, Inc. v. Shivers & Assoc., Inc.*, 705 F.Supp. 556, 558–60 (S.D.Fla. 1989) (collecting cases from other jurisdictions, and holding that, under Florida law, time-share purchasers who obtained a right to exclusive use and occupancy of a specific unit had purchased an interest in real property).

throughout the year, with the exception of weekends surrounding three popular travel holidays. However, as a result the LiVorio–Sabatini Group's "bust-out" scheme and continual looting of the company's assets, Class Plaintiffs became so disenchanted with the facilities, personnel and condition of the resorts that they almost immediately decided to abandon their purchases and vowed never to return. "The substantial value of property lies in its use. If the right of use is denied, the value of the property is annihilated and ownership is rendered a barren right." 16 Ohio Jur.3d *Constitutional Law* § 489 (1979).

Class Plaintiffs' testimony establishes that they suffered injury to their use and enjoyment of the resorts by the time the Campgrounds filed for bankruptcy in October 1988. For example, Class Plaintiffs Frank and Lois Slentz purchased their interest in the Campgrounds on July 6, 1987. The Slentzes returned to the Campgrounds only twice after that date and never used the facilities for their enjoyment or recreation. Lois Slentz testified that when they visited the Campgrounds for the third and last time near the end of July 1987, they found the facilities in disrepair, with no evidence of the promised construction to improve and expand the campsites. As a result, the Slentzes never again returned to the Campgrounds and never made any use of the facilities.

Class Plaintiffs William and Lola Isaak had a similar experience with their interest in the Campgrounds. The Isaaks purchased their interest on January 4, 1987, and used the facilities intermittently until August 1988. William Isaak testified that although the owners of the Campgrounds apparently had funds to maintain a lavish lifestyle, they refused to respond to his specific requests for maintenance and repairs. In August 1988, the Isaaks removed their trailer from the Campgrounds and abandoned their interest because the lack of development and failure to maintain the Campgrounds destroyed their ability to use and enjoy the property. The record indicates that the remaining class representatives' ability to use and enjoy the Campgrounds similarly suffered as a result of the RICO violations.

### 2. *Injury to ability to transfer or dispose of undivided interests in campsites*

The Agreements For Deed further provided for Plaintiffs' sale or transfer of their undivided interests in the Campgrounds. The deeds provided that while Plaintiffs could not transfer their interest without written consent of the Campgrounds, that consent "shall not be unreasonably withheld." However, the "bust-out" scheme injured Plaintiffs' ability to dispose of their interests because the underdeveloped and disappointing conditions of the Campgrounds, at the very least, reduced any potential resale value—particularly once the resorts filed for bankruptcy. Indeed, Class Plaintiffs Edmund and Judith Gray unsuccessfully tried to sell their interest in the Campgrounds in March 1987, only two months after their purchase. By looting the Campgrounds of all assets rather than using Plaintiffs' payments to invest in development of the resorts, the owners impeded Plaintiffs' property right to dispose or transfer of their interests by the time of the bankruptcy filing.

### C.

We conclude that Plaintiffs suffered definable and ascertainable injury to their property interests in the Campgrounds by the time of the bankruptcy filing in October 1988. Plaintiffs' narrow definition of their property interests as nothing more than a contractual right to fully developed campgrounds ignores both the record below and state property law. The LiVorio–Sabatini Group's fraudulent "bust-out" scheme injured Plaintiffs in a variety of ways by the time of the bankruptcy filing: Plaintiffs suffered monetary damage in the form of down payments and interest payments on the land; Plaintiffs were unable to exercise their right to use and enjoy the land; and Plaintiffs were unable to exercise their right to dispose of their interests in the property. Accordingly, we agree with the district court that Plaintiffs had standing to bring a cause of action under RICO no later than the time of the bankruptcy filing.

## III.

 Having found that Plaintiffs had attained standing to bring a RICO claim by October 1988, we now consider whether Plaintiffs' RICO cause of action accrued more than four years before the first complaint was filed on May 25, 1993. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 152, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (holding that civil RICO actions are subject to a four-year statute of limitations). "[A] civil RICO cause of action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *Agristor Fin. Corp. v. Van Sickle,* 967 F.2d 233, 241 (6th Cir.1992) (quoting *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.,* 906 F.2d 1546, 1554–55 (11th Cir.1990)); *see also Caproni v. Prudential Sec., Inc.,* 15 F.3d 614, 619 (6th Cir.1994). A "pattern" for RICO purposes consists of at least two related predicate acts of racketeering activity, such as wire and mail fraud, that together constitute a continuing course of fraudulent conduct. *See Vild v. Visconsi,* 956 F.2d 560, 565 (6th Cir.1992); 18 U.S.C. § 1961(5).

Plaintiffs contend that the earliest they could have learned of the "bust-out" scheme involving the Agreements For Deed was after completion of the bankruptcy proceedings in 1991. We disagree, and instead hold that Class Plaintiffs knew or reasonably should have known that they had suffered an injury and that the injury was a result of racketeering activity more than four years before the first complaint was filed on May 25, 1993.

In *Harner v. Prudential–Bache Sec., Inc.,* a panel of this Court held that, with regard to a civil RICO claim, "the running of the statute of limitations begins when a plaintiff is put on inquiry notice—that is, when the plaintiff has been presented with evidence suggesting the possibility of fraud." 35 F.3d 565 (table), 1994 WL 494871, at *4 (6th Cir. 1994) (unpublished disposition). "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Id.* (quoting *Kennedy v. Josephthal &*

*Co.,* 814 F.2d 798, 802 (1st Cir.1987)). This Court explained:

> The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.

*Id.* (quoting *Jensen v. Snellings,* 636 F.Supp. 1305, 1309 (E.D.La.1986)). Other Courts of Appeals have similarly likened inquiry notice to "storm warnings" of possible fraud that trigger a plaintiff's duty to investigate in a reasonably diligent manner. *See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 129 F.3d 222, 224 (1st Cir. 1997); *Great Rivers Coop. v. Farmland Indus., Inc.,* 120 F.3d 893, 896 (8th Cir.1997).

In *Cooperativa de Ahorro,* the First Circuit stated that it "need not decide whether the statute of limitations begins to run on the date the storm warnings appear or the later date on which an inquiring investor would through reasonable diligence have discovered the fraud. The time between the two dates in most cases is not likely to be long enough to affect the outcome." *Cooperativa de Ahorro y Credito Aguada,* 129 F.3d at 225 (citations omitted). Such is the case here. Our review of the record indicates that Class Plaintiffs either knew or should have known of the facts underlying the LiVorio–Sabatini Group's fraudulent "bust-out" scheme more than four years before filing suit against the defendant banks.

### A.

Class Plaintiffs' own testimony indicates that they knew of both the source and existence of their injuries more than four years prior to bringing suit. Most striking is the testimony of Class Plaintiff William Isaak, who, along with his wife, removed his trailer from the Campgrounds in August 1988— three months before the bankruptcy filing. The Isaaks never again returned to the resort and stopped making payments under the terms of their promissory note. William Isaak specifically attributed his decision to abandon the Campgrounds to his belief that

the LiVorio–Sabatini Group was looting money from the company for its own personal gain while allowing the Campgrounds to fall into disrepair:

> I felt that the group running The Landing must have been living at a very lavish lifestyle, because they were driving very expensive cars. The owner supposedly of the campground corporation flew into the meetings in a helicopter, *and I figured, 'Well, these guys must be taking money out of the campground that I am a member of.'* ... *I figured they were taking money out and using it for things other than maintaining the campground.* And I had a suspicion, talking with various people, that the next thing was bankruptcy. ...

(emphasis supplied) (J.A. at 4177.) [5] William Isaak thus ascertained both the existence and source of his injury in August 1988 when he abandoned his interest. The existence of the injury was that the Campgrounds were not being developed as promised, and, in fact, the facilities were deteriorating to such a degree he could no longer use and enjoy his property. The source of the injury, as Isaak observed, was the precise fraudulent "bustout" scheme alleged in Plaintiffs' complaints: the owners were looting the Campgrounds of their assets instead of using the money to develop and maintain the property. Still, although the Campgrounds declared bankruptcy three months later—just as William Isaak had predicted—he did not file suit until five years after his last visit to the Landing.

Other Plaintiffs experienced similar disappointments with the Campgrounds that led them to suspect wrongdoing before the Campgrounds filed for bankruptcy. Frank Slentz testified that he suspected wrongdoing from the date of purchase (July 6, 1987), and that this suspicion led him to abandon his interest when he visited the Campgrounds only three weeks later and determined, from the poor conditions of the facilities, that the owners were not going to fulfill their promises to develop the Campgrounds. Lois Slentz testified that she and her husband

first considered contacting legal counsel within six months to a year after their purchase—again, well before the Campgrounds filed for bankruptcy in October 1988.

The remaining Class Plaintiffs similarly abandoned their interests in the Campgrounds prior to the bankruptcy filing due to their disappointment in the deteriorating condition of the facilities. In addition, these Plaintiffs had abundant access to information concerning fraudulent activity at the Campgrounds, including widespread newspaper reports of the state investigation into illegal sales practices and Class Plaintiffs' personal experiences with the resorts. A number of Class Plaintiffs personally complained about the Campgrounds to either the Better Business Bureau or to state authorities. Moreover, in February 1988, Class Plaintiff Melody Brammer was contacted by an attorney purportedly filing a class action suit against the Campgrounds.

Despite the existence of these various "storm warnings" and other indicia of possible fraud, Class Plaintiffs took no action when the Campgrounds finally filed for bankruptcy in October 1988. The bankruptcy filing received considerable coverage in the local press, and one article reported the state Attorney General office's warning that the Campgrounds could "use bankruptcy as a shelter to avoid living up to building the promised improvements to campgrounds facilities"—the very fraud alleged in Plaintiffs' complaints. Additionally, the bankruptcy trustee appointed an official committee to represent the interests of the "owner campers" at each campground, and the owner campers were also able to participate in the bankruptcy proceeding through their attendance at well-publicized meetings beginning in November 1988. However, the Class Plaintiffs never attended any of these meetings, or the bankruptcy proceeding hearings, all of which were open to the public.

In late January 1989, local newspapers reported that federal law enforcement agents

---

**5.** William Isaak further testified: "I believe I already said that about the big cars and helicopters and things like that, and that was not something that you could buy on a $500 a week salary. *It represents big bucks and it had to come from someplace other than legitimate channels.*" (emphasis supplied) (J.A. at 4206.)

had seized all available records of the Campgrounds and related corporations amid express allegations of the diversion of funds. These articles reported that an FBI agent had filed an affidavit alleging, among other things, that the LiVorio–Sabatini Group had diverted Plaintiffs' payments for their personal use. One article published on January 21, 1989, read in relevant part:

> According to the affidavit, loan payments from members that were to be paid by Eastern Resorts [corporate parent of the LiVorio–Sabatini Group] to the financial institutions that loaned the money were frequently diverted into accounts to pay bills incurred by Eastern Resorts companies. . . . [The affidavit also alleged that] officers of the company used company funds to pay off personal debts, such as vehicle loans and leases related to boats at Cleveland and Pittsburgh marinas. . . . Those practices had begun as early as June 1985 and continued at least through last month. . . .

(J.A. at 1253.) These articles further reported that Campgrounds officials were suspected of altering and destroying records in an effort to interfere with a federal grand jury investigation, and that the FBI was investigating possible federal bank fraud, mail fraud, tax evasion and obstruction of justice charges. The articles reported that Eastern Resorts had been under federal investigation since June 1986, when the possibility of fraud against Bank One became known, and that a Bank One official had been indicted in November 1988 as a result of this investigation.

### B.

■ Under these facts, we conclude that Plaintiffs discovered, or reasonably should have discovered before May 25, 1989, both the existence and source of their RICO injuries and that the injuries were part of a pattern. For example, in *Agristor*, a dairy farm brought a RICO claim against the manufacturer of poisonous grain storage silos that caused the death and illness of many calves. *Agristor*, 967 F.2d 233 (6th Cir.1992). We held that the RICO claim was time-barred because the farm knew or should have known of the alleged injuries and the

source of injuries more than four years before bringing suit in 1987. We noted that, by 1982, the farm had begun to experience the deaths of many calves in addition to other persistent problems. *Id.* at 241. Although the farm may not have had subjective knowledge linking its injuries to the silos, we held, as a matter of law, that a reasonable person should have determined that the calf losses were caused by the silos. *Id.* We found that under the same facts the farm also should have discovered that their injuries were part of a pattern for RICO purposes where the sale of the silos entailed a number of related predicate acts known to the farm. *Id; see also Caproni,* 15 F.3d at 619–20 (holding that the plaintiff investor's RICO claim against her financial advisor was time-barred where the plaintiff began having continually escalating concerns about her investments more than six years before filing suit, when her investments began declining at progressively greater losses).

The record indicates that Plaintiffs here were aware of their injuries even before the Campgrounds filed for bankruptcy. Each of the Class Plaintiffs had either retained counsel, filed formal complaints with governmental agencies, and/or abandoned their ownership interests prior to October 1988. Moreover, a number of Class Plaintiffs expressly stated that they harbored suspicions of criminal or fraudulent activity at this time. Shortly after the bankruptcy, local newspapers widely reported that the Campgrounds were under federal investigation for the schematic diversion of Plaintiffs' funds for the owners' personal use, and that one individual had been indicted in November 1988 in relation to this scheme.

Class Plaintiffs in the beginning of 1989 thus had available to them considerably more information concerning the source and nature of their injuries than the plaintiffs in *Agristor* or *Caproni*. Plaintiffs' failure to conduct a reasonable investigation and file suit shortly thereafter precludes them bringing a claim more than four years later. The Supreme Court has explained that the limitations period under RICO exists to prevent plaintiffs who know of the defendant's pattern of fraudulent activity from "sleeping on

402

their rights" and "bringing suit only long after the 'memories of witnesses have faded or evidence is lost.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187, 117 S.Ct. 1984, 1989, 138 L.Ed.2d 373 (1997) (quoting *Wilson v. Garcia*, 471 U.S. 261, 271, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). Accordingly, we find that Plaintiffs' RICO claims against the defendant banks are time-barred because their cause of action accrued more than four years before the complaints were filed in 1993.

### IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendant banks.