*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0378p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CLIFTON E. JACKSON; CHRISTOPHER M.
SCHARNITZKE, on behalf of themselves and
all other persons similarly situated,
>                     *Plaintiffs-Appellants*,

v.

SEGWICK CLAIMS MANAGEMENT SERVICES,
INC.; COCA-COLA ENTERPRISES, INC., foreign
corporations; DR. PAUL DROUILLARD, jointly
and severally,
>                     *Defendants-Appellees*.

No. 10-1453

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-11529—Nancy G. Edmunds, District Judge.

Argued: July 19, 2011

Decided and Filed:  November 2, 2012

Before:  BATCHELDER, Chief Judge; GUY and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Marshall Lasser, MARSHALL LASSER, P.C., Southfield, Michigan, for
Appellants.  Kathleen H. Klaus, MADDIN HAUSER WARTELL, ROTH & HELLER,
P.C., Southfield, Michigan, Matthew F. Leitman, MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C., Troy, Michigan, Daniel B. Tukel, BUTZEL LONG, Detroit,
Michigan, for Appellees.  **ON BRIEF:** Marshall Lasser, MARSHALL LASSER, P.C.,
Southfield, Michigan, Jeffrey T. Stewart, SEIKALY & STEWART, P.C., Southfield,
Michigan, for Appellants.  Kathleen H. Klaus, MADDIN HAUSER WARTELL, ROTH
& HELLER, P.C., Southfield, Michigan, Matthew F. Leitman, Thomas W. Cranmer,
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Troy, Michigan, Daniel B.
Tukel, BUTZEL LONG, Detroit, Michigan, Michael F. Smith, THE SMITH
APPELLATE LAW FIRM, Washington, D.C., for Appellees.  Mark F. Horning, Jeffrey
M. Theodore, STEPTOE & JOHNSON LLP, Washington, D.C., for Amici Curiae.

1

MOORE, J., delivered the opinion of the court, in which GUY, J., joined, and BATCHELDER, C. J., joined in the judgment.  BATCHELDER, C. J. (pp. 21–25), delivered a separate opinion concurring in the judgment, which GUY, J., joined.

———————————————

**OPINION**

———————————————

KAREN NELSON MOORE, Circuit Judge.  Clifton Jackson and Christopher Scharnitzke are former employees of Coca-Cola Enterprises ("Coca-Cola") who claim that they were injured while performing their jobs.  When they reported their injuries to Coca-Cola's third-party administrator for worker's compensation claims, Sedgwick Claims Management Service ("Sedgwick"),[1] Sedgwick denied them both benefits.  The plaintiffs claim that the medical evidence strongly supported their injuries, but that Sedgwick engaged in a fraudulent scheme involving the mail—and in the case of Jackson using Dr. Drouillard as a "cut-off" doctor—to avoid paying benefits to injured employees.  The plaintiffs sued in federal court alleging that the actions of Sedgwick, Coca-Cola, and Dr. Drouillard violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961(1)(B), 1962(c), and 1964(c) ("RICO").  The district court dismissed the lawsuit.

Since the district court's dismissal, several issues on this appeal were resolved by our opinion in *Brown v. Cassens Transport Co.*, 675 F.3d 946 (6th Cir. 2012) ("*Brown II*").  We also disagree with the district court's application of the elements of a RICO cause of action to the plaintiffs' allegations in the complaint.  We therefore **REVERSE** the district court's judgment and **REMAND** the case for further proceedings consistent with this opinion.

**I.  BACKGROUND**

Clifton Jackson was employed by Coca-Cola when he allegedly injured his lumbosacral spine at work in September 2007.  R. 2 (Am. Compl. ¶ 31A) (Page ID #39).

———————————————

[1]The caption says "Segwick" but the company spells it "Sedgwick."

Jackson was treated at the Henry Ford Hospital by Dr. Shlomo Mandel, a specialist in the lower back. Dr. Mandel determined that the work-related injury rendered Jackson disabled. In May 2008, Sedgwick requested a second opinion by Dr. Terry Weingarden, an expert paid for by the defendants. Dr. Weingarden also determined that Jackson was disabled from a work-related injury. *Id.* Sedgwick asked Dr. Weingarden to review Jackson for a second time, and Dr. Weingarden again determined that Jackson was disabled. *Id.*

After obtaining three reports confirming Jackson's disability, in January 2009, Sedgwick mailed a letter to Jackson requesting yet another examination, this time by Dr. Paul Drouillard. *Id.* (Page ID #40). Plaintiffs allege that Dr. Drouillard is not a back surgeon and was hired by Sedgwick as a "cut-off" doctor to provide false medical reports and participate in a scheme dishonestly to deprive Coca-Cola employees of their statutory benefits under the Michigan Worker's Disability Compensation Act ("WDCA"), Mich. Comp. Laws § 418.301. *Id.* at ¶¶ 12, 13, 15, 31. After Jackson met with Dr. Drouillard, Dr. Drouillard mailed a report to Sedgwick stating that Jackson was not disabled. Dr. Drouillard's report contains three statements by Jackson regarding the scope of his pain that Jackson claims he never made and several conclusions about the nature of Jackson's physical injury that Jackson claims are wholly unsupported by the medical evidence. *Id.* at ¶ 31A. Sedgwick relied on this report to terminate Jackson's benefits.

Christopher Scharnitzke was employed as a truck driver when he allegedly injured his shoulder because of, he claims, extensive lifting at work. He ceased working from August 2007 to February 2008 due to the injury, but did not seek worker's compensation for that time. *Id.* at 31B (Page ID #41-42). From 2004 to 2007, on three separate occasions, he reported to his family doctor that he experienced left shoulder pain while doing heavy lifting at work. In August 2007, Dr. Marc Milia, an orthopedic surgeon, observed similar pain from the work Scharnitzke was performing. The doctor performed an MRI and diagnosed Scharnitzke with "acromioclavicular arthritis." Dr. Milia treated Scharnitzke and authorized him to return to work in February 2008.

Scharnitzke continued to work until March 4, 2008, when he experienced "instant pain" in his left shoulder while pulling a 300-pound two-wheeler cart of product up a flight of stairs. He was sent to the company's clinic, Concentra Medical Center, that same day. *Id.* (Page ID #42). On March 11, 2008, the Concentra doctor observed that Scharnitzke had a "minor work aggravation" and a "chronic shoulder problem." *Id.* (Page ID #43). The Concentra records concluded that Scharnitzke was disabled due to his shoulder condition and referred Scharnitzke back to his orthopedic surgeon. The records were sent to Sedgwick, which then mailed a notice of dispute claiming that his March treatment was not related to a work injury but was instead due to "acromioclavicular arthritis." *Id.* Scharnitzke alleges that Sedgwick had no information at that time to suggest his March injury was related to arthritis and not the "minor work aggravation" indicated in the Concentra records, which should have entitled him to worker's compensation. *Id.*

Sedgwick and Coca-Cola continued to deny Scharntizke benefits after receiving numerous updates from Dr. Milia about the nature of Scharnitzke's injuries. In April 2009, Sedgwick received a note from Dr. Milia, Scharnitzke's orthopedic surgeon, clarifying that "[h]is current shoulder disability . . . was caused by the 13 years of repetitive heavy lifting and pulling required by Mr. Scharnitzke's job at Coca-Cola, and was also caused by the injury at work on 3/3/08." *Id.* (Page ID #44). After receiving Dr. Milia's note, Sedgwick continued to deny Scharnitzke benefits.

Scharnitzke and Jackson both filed petitions for benefits with Michigan's Workers' Compensation Agency Board of Magistrates (the "Board"). We were informed at oral argument that Jackson settled his benefits claim shortly after the district court dismissed his RICO suit. On May 13, 2010, the Board awarded Scharnitzke benefits starting from the injury in March 2008 until July 2009, but found no evidence that his prior leave from July 30, 2007 to February 11, 2008, was work related. *Scharnitzke v. Coca-Cola Enters., Inc.* (May 13, 2010), *available online* at http://www.dleg.state.mi.us/WCA/PDFS/Opinions_051409/2010/scharnitzke.christop her.5.13.10.pdf. The Workers' Compensation Appellate Commission affirmed in part

and reversed in part, agreeing that Scharnitzke was entitled to benefits starting in March 2008 but only through January 2009. *Scharnitzke v. Coca-Cola Enters., Inc.*, No. 10-0061 (May 11, 2011), *available online at* http://www.dleg.state.mi.us/ham/wcac/11pdfa/07400061.pdf. Both parties sought leave to appeal the decision before the Michigan Court of Appeals, which was granted on March 1, 2012. *Scharnitzke v. Coca-Cola Enters.*, No. 304515 (Mich. Ct. App.). As of the time of filing, briefing appears completed but no decision has been issued.

In April 2009, Jackson and Scharnitzke filed suit together in the U.S. District Court for the Eastern District of Michigan seeking equitable and monetary relief under RICO. Jackson brought his claim against Sedgwick, Coca-Cola, and Dr. Drouillard; Scharnitzke sued just Sedgwick and Coca-Cola. The plaintiffs amended their complaint once as of right to include a request for class certification. R. 2 (Am. Compl. at 22) (Page ID #45). They later sought leave to file a second amended complaint adding another plaintiff, Paul Lulek, who also wanted to sue Sedgwick and Dr. Drouillard, identifying additional predicate acts of mail fraud, and adding a claim of RICO conspiracy. *See* R. 44-1 (2d Am. Compl. ¶¶ 30A, 31, 31C). Meanwhile, the defendants filed a motion to dismiss.

The district court granted the defendants' motions to dismiss and denied leave to amend the complaint on the basis of futility. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 09-11529, 2010 WL 931864 (E.D. Mich. Mar. 11, 2010). The district court held that the plaintiffs' claims could be dismissed on the basis of three alternative grounds: (1) RICO does not provide a remedy that is functionally an "'end run' around the exclusive procedures and remedies" provided for under the WDCA; (2) the plaintiffs' claims were not ripe; and (3) the plaintiffs failed to state a cognizable RICO claim. *Jackson*, 2010 WL 931864, at *14. The district court also determined that if the plaintiffs had stated a valid RICO claim, the *Burford*-abstention and primary-jurisdiction

doctrines would require staying the federal proceedings pending the outcome of the plaintiffs' claims before the state Board.  Jackson and Scharnitzke timely appealed.[2]

## II.  RICO CLAIM

### A.  Standard of Review

We review de novo the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6).  *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1583 (2012).  To satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a)(2), the complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In reviewing a complaint, we accept all the allegations of the plaintiff's complaint as true and consider whether such allegations are sufficient to state a claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  This standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."[3] *Id.* (internal quotation marks omitted).  A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Because RICO claims require proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b) with respect to the elements of fraud.  "Rule 9(b) states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances

---

[2]The plaintiffs appealed from the order granting the motion to dismiss and denying leave to amend, but they do not make any arguments with respect to their motion for leave to amend until their reply brief.  However, in many instances, the district court considered the proposed amendments when analyzing the motion to dismiss, the grant of which is appealed and discussed at length.  Therefore, to the extent the district court's motion-to-dismiss analysis relies on the proposed amendments, we will consider them on appeal rather than deem those arguments waived.  We leave it to the parties and the district court whether leave to amend should be reconsidered on remand.

[3]The plaintiffs argue that the heightened pleading standard in *Twombly* is inapplicable to small-scale, civil RICO cases, in which the discovery expenses are less than in large-scale antitrust cases.  This argument is untenable.  After *Iqbal*, we apply the plausibility standard across the board.  556 U.S. at 684.

constituting fraud or mistake.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting Fed. R. Civ. P. 9(b)).[4] This includes alleging the "time, place, and content" of the fraudulent acts, the existence of a fraudulent scheme, the intent of the participants in the scheme, and "the injury resulting from the fraud." *Id.* (internal quotation marks omitted).

## B.  Threshold Issues

Several issues in this case were recently resolved by our opinion in *Brown II*, 675 F.3d 946.  We address these arguments, as well as the inapplicability of the *Rooker-Feldman* doctrine and the various other abstention doctrines, before turning to the elements of a RICO claim and the sufficiency of the plaintiffs' pleadings.

### 1.  Relationship Between RICO and WDCA

The district court's holding that RICO cannot provide a remedy for mail fraud in the context of obtaining worker's compensation is untenable in light of our recent opinion in *Brown II*, 675 F.3d 946.  In *Brown II*, we held that the Supremacy Clause preempts the Michigan legislature from eliminating a RICO remedy simply by declaring its worker's compensation scheme to be exclusive of federal remedies.[5]  "[T]he predicate offense for the RICO action is mail fraud, not the denial of worker's compensation." *Id.* at 954.  It is therefore irrelevant whether the WDCA provides a state administrative remedy for addressing the fraudulent denial of worker's compensation benefits.  Nor

---

[4] The plaintiffs also argue that, by invoking Rule 11(b)(3), they should be entitled to discovery before their complaint is dismissed for lack of particularly under Rule 9(b). *See Brown v. Cassens Transp. Co.*, 546 F.3d 347, 356 n.4 (6th Cir. 2008) ("*Brown I*") (citing cases but declining to decide the issue), *cert. denied*, 130 S. Ct. 795 (2009).  Because we hold that the plaintiffs have adequately pleaded a RICO claim, we again decline to resolve this issue.

[5] The concurrence makes the unsubstantiated assertion that in a worker's compensation program, employees relinquish the right to litigate all claims in exchange for no-fault insurance coverage.  However, *Howard Delivery Service v. Zurich American Insurance Co.*, 547 U.S. 651 (2006), the case upon which the concurrence relies, merely stands for the proposition that worker's compensation programs protect the employer from common-law tort claims related to the alleged workplace injury. *Id.* at 662–63.  Here, the plaintiffs do not seek to litigate, or relitigate, tort-based workplace-injury claims.  Rather, the plaintiffs are challenging what they allege to be a fraudulent administrative process by which one seeks to make a worker's compensation claim to Sedgwick.  A civil RICO claim not only includes elements distinct from those in a common-law tort claim, but also must withstand heightened scrutiny under Rule 9(b) pleading standards.  In sum, the worker's compensation program does not offer complete immunity to an employer, and this action is not a second bite at the apple, as the concurrence intimates.

does the existence of a state administrative scheme that does not provide for such a right of action trump the availability of remedies under RICO as it might in the context of a parallel federal administrative scheme. "[T]he fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute." *Id.* at 954-55 (quoting *Parr v. United States*, 363 U.S. 370, 389 (1960)). This is because "enabling statutes for state agencies, passed by state legislatures, say nothing about Congress's intent with regard to RICO." *Id.* at 955. Simply put, "Michigan cannot limit the scope of a federal RICO cause of action." *Id.*

Some of the defendants' arguments are slightly different than the ones we addressed in *Brown II*. Coca-Cola and Dr. Drouillard point us to 28 U.S.C. § 1445(c), which prohibits removing to federal court civil suits "arising under the workmen's compensation laws" of any state. However, even if § 1445(c) changes the analysis, this case was not removed under § 1445(c); therefore, the statute simply does not apply. In the ripeness portion of its brief, Coca-Cola imports the clear-statement rule from criminal RICO cases. Coca-Cola contends that "Congress must speak with special clarity before a federal statute may be construed in a manner that displaces a policy choice made by a State." Appellee Coca-Cola Br. at 25 (internal quotation marks and alteration marks omitted). The cases that Coca-Cola cites, however, are concerned with the "sweeping expansion of federal *criminal* jurisdiction," not civil. *Cleveland v. United States*, 531 U.S. 12, 24 (2000) (emphasis added). Furthermore, *Cleveland* held that state licenses are not "property" *of the state* within the meaning of the mail-fraud statute because the state's interest is regulatory in nature. *Id.* at 22. As we discuss below, the state has created an entitlement to the property in question in the individual recipient.[6] Any lack of clarity about the mail-fraud statute as applied in *Cleveland* is simply not present in this case.

---

[6]The concurrence contends that *Brown II* incorrectly enables an employee's workplace injury to satisfy the RICO requirement that the injury be to business or property. This assertion misconstrues the holding in *Brown II* in order to manufacture a disagreement on an issue not before this court. There is no dispute that an allegation of workplace injuries is insufficient by itself to support a civil RICO claim. Here, as in *Brown II*, the plaintiffs allege a property interest in bringing a worker's compensation claim free of fraud—i.e., they allege a devaluation of a statutory expectancy of worker's compensation benefits. This theory of liability as pleaded by the plaintiffs is entirely distinct from a run-of-the-mill tort claim in which a plaintiff seeks damages apart from worker's compensation based on a personal injury at work.

### 2. The Plaintiffs' Injuries are Ripe

We held in *Brown II* that injured Michigan employees "acquire a property interest in worker's compensation when employers learn of their employees' physical injuries." *Brown II*, 675 F.3d at 963. The fraudulent denial of these benefits causes injury to this property interest, and the value of the lost property interest is readily ascertainable—it is the value of the worker's compensation that the plaintiff was entitled to receive under the WDCA's scheme for calculating benefits. *See Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (RICO damages must be "established by competent proof, not based upon mere speculation and surmise"), *cert. denied*, 493 U.S. 1074 (1990); *see also Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992) (requiring RICO violation proximately cause plaintiff's injuries). Because the injury occurs at the time of the fraudulent denial of benefits, the plaintiffs' claims in this case were ripe at the time they filed their lawsuit. The district court therefore erred in determining that the plaintiffs' injury is "conjectural and hypothetical" until they have proven their entitlement in state proceedings. *Jackson*, 2010 WL 931864, at *21 & n.33, *22 & n.34.

That is not to say that the state proceedings will be irrelevant; however, they will affect the *amount* of damages the plaintiffs are entitled to receive rather than the *existence* of the damages in the first place. By the time we issued our opinion in *Brown II*, all of the plaintiffs there had settled their worker's compensation claims with their employer. In such cases, we stated that the primary damages would be the difference between the amount the plaintiffs received in settlement and the amount they would have received but for the fraud. 675 F.3d at 967. This calculus remains applicable in this case because Jackson has also settled his claims. Scharnitzke, on the other hand, has already received a ruling that he is entitled to some benefits, a ruling which is being appealed. The outcome of that appeal may certainly be relevant on the amount of damages that Scharnitzke may receive in this case, but the possibility of future mitigation of damages

does not make the injury itself less ripe at the time it occurred (or the total value of the damages less ascertainable).**7**

We acknowledge that one of our sister circuits currently disagrees with this approach. The Second Circuit has adopted a rule that RICO claims are not ripe "until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995). But to the extent that this rule has been followed by other circuits, the focus has been on the speculative nature of the damages themselves and not their amount. *See Evans v. City of Chicago*, 434 F.3d 916, 932 (7th Cir. 2006) (adopting standard but focusing on indirect nature of injuries rather than their amount); *Maio v. Aetna, Inc.*, 221 F.3d 472, 495 (3d Cir. 2000) (holding no RICO cause of action because factual predicate necessary for damages to be incurred at all too speculative); *DeMauro v. DeMauro*, 115 F.3d 94, 97-98 (1st Cir. 1997) (adopting "clear and definite" standard but focusing on existence of damages in the first place).

Other circuits have simply declined to adopt this rule as overly rigid. *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount."), *cert. denied*, 535 U.S. 927 (2002); *Grimmett v. Brown*, 75 F.3d 506, 516-17 (9th Cir. 1996) (holding "error to equate" a situation where "the injury is speculative because it is not known whether it will occur at all" to a situation where "the injury has occurred and is known, but it is speculative whether the damages might be reduced or even eliminated by alternative recovery efforts"), *cert. dismissed*, 519 U.S. 233 (1997); *see also Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350-51 (11th Cir. 2008) (noting that even Second Circuit rule does not make a RICO injury unripe based solely on the "mere possibility" of recovery in a state proceeding); PAUL A. BATISTA, CIVIL RICO PRACTICE MANUAL

---

**7**It is unclear from where the concurrence derives its statement that we would use as evidence of entitlement to damages the fact that an employee had settled his or her claim with the employer. In fact, *Brown II* restricts plaintiffs from recovering damages under a civil RICO claim that they had already received as part of the settlement agreement. 675 F.3d at 967.

§ 4.22[D] (3d ed. 2008) ("[*Gelt* is] a case to which the Second Circuit rigidly adheres and which most other circuits tend to ignore or downplay.").

As the Ninth Circuit noted, the Second Circuit's "clear and definite" amount rule was taken from an earlier Second Circuit case that held that a plaintiff's claims were not ripe if the plaintiff might recover damages from a pending bankruptcy proceeding. *Grimmett*, 75 F.3d at 516 (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988)). Like the Ninth Circuit, we also have similar precedent directly contradicting that rule. In *Isaak v. Trumbull Savings & Loan Co.*, 169 F.3d 390 (6th Cir. 1999), we held that the plaintiffs' RICO claim accrued for statute of limitations purposes at the time the scheme was completed, because that was when the injuries became "ascertainable and definable." *Id.* at 396-97. Citing *Grimmett*, we held that "[t]he possibility that Plaintiffs might have been able to recover some of the damages during the course of the bankruptcy proceedings does not negate the existence of injury at the time of the bankruptcy filing." *Id.* at 397. We are not at liberty to depart from this precedent here today.

The plaintiffs' injuries were definite and ascertainable at the time of the allegedly fraudulent denial of their benefits. Any speculative future recovery in state proceedings may affect the amount of damages the plaintiffs can receive, but has no bearing on the accrual of a cause of action under RICO. The plaintiffs' claims are ripe.

### 3. *Rooker-Feldman* Doctrine

Dr. Drouillard argues that the *Rooker-Feldman* doctrine also justifies dismissing Jackson's RICO claim because Jackson in essence will be challenging an unfavorable ruling by the state's WDCA Board. Drouillard Appellee Br. at 44-47. This argument was raised, however, before Jackson settled his claims. Because there is no longer the potential of a state decision for Jackson to challenge, *Rooker-Feldman* has no potential applicability to Jackson. The remaining defendants have not raised the issue of *Rooker-Feldman* as a bar to Scharnitzke's claims. However, because the doctrine relates to subject-matter jurisdiction, we briefly explain why the doctrine does not bar our review.

*Rooker-Feldman* applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Put differently, "[t]he pertinent question . . . is whether the source of the injury upon which plaintiff bases his federal claim is the state court judgment." *In re Squire*, 617 F.3d 461, 465 (6th Cir. 2010) (internal quotation marks omitted). Here, however, the source of the injury was the initial fraudulent denial of benefits. As we have already discussed at length both in this opinion and in *Brown II*, the source of the injury here is that fraudulent denial of benefits, not any future state-court judgment.

**4. Abstention Doctrines**

The district court held that, if the plaintiffs' claims survived a motion to dismiss, it would stay the proceedings "pending a final determination of Plaintiffs' eligibility for worker's compensation benefits under the WDCA." *Jackson*, 2010 WL 931864, at *14. Because Jackson's claim has settled, abstention is no longer an issue for his claims. Scharnitzke was awarded benefits, and his claims are pending on appeal. For many of the reasons already discussed, however, abstention is not warranted in this case.

**a.  *Burford* Abstention**

Federal courts may invoke *Burford* abstention when "the State's interests are paramount and [the] dispute would best be adjudicated in a state forum." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (citing *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)). When a complaint seeks only monetary damages, the doctrine justifies a stay, not a dismissal. *Id.* at 719. *Burford* abstention is not necessary here because the RICO inquiry does not present "difficult questions of state law" nor would it "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Rouse v. DaimlerChrysler Corp. UAW Non-Contributory Plan*, 300 F.3d 711, 716 (6th Cir. 2002). This complaint seeks only monetary damages relating to mail fraud, not additional worker's compensation. *Burford* abstention therefore does not apply.

### b.  Primary Jurisdiction

The primary-jurisdiction doctrine also does not apply here.  The doctrine applies when "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."  *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).  Because Jackson and Scharnitzke have a property interest *notwithstanding* the resolution of their underlying claims to worker's compensation benefits, the primary-jurisdiction doctrine does not apply.

## C.  Elements of a RICO Claim

The district court also dismissed the plaintiffs' claims for failing adequately to plead the many requirements that make up a RICO claim.  We disagree.

### 1.  Existence of an Enterprise

The plaintiffs' complaint identified five potential RICO enterprises, each involving different combinations of the defendants.  R. 2 (Am. Compl. ¶ 9) (Page ID #26).  The primary enterprise consisted of "[t]he workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation claims and associating in fact," including, among others, La Tara Lewis, the Sedgwick employee who mailed the request for a third medical examination to Jackson.  *Id.*  The alternative enterprises consisted of (1) Sedgwick's personnel handling claims, (2) Sedgwick's personnel and Dr. Drouillard, (3) Sedgwick's and Coca-Cola's personnel and Dr. Drouillard, (4) and any workers-compensation attorneys that participated in the fraud.  *Id.* (Page ID #27).  The plaintiffs pleaded that each of these enterprises, acting alone or in concert, existed "for the purpose of defrauding plaintiffs of their workers compensation benefits . . . for many years."  *Id.* at ¶ 10.

The district court assumed that the pleadings adequately established an enterprise, although it deemed such a determination highly questionable in part due to the plaintiffs' choice to plead six enterprises in the alternative.  *Jackson*, 2010 WL

931864, at *23. Equivocation about the constitution of the enterprise, however, does not undermine the plausibility of the pleadings. "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2); *Jordan v. City of Cleveland*, 464 F.3d 584, 604 (6th Cir. 2006) ("Lawyers cannot preordain which claims will carry the day and which will be treated less favorably. Good lawyering as well as ethical compliance often requires lawyers to plead in the alternative.").

A RICO "enterprise includes any union or group of individuals associated in fact . . . for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009). The association must have structure, meaning "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. Any one of the plaintiffs' combinations of the defendants and various other parties would be sufficient to establish a RICO enterprise under this broad standard. The complaint sufficiently alleges the existence of multiple people acting in concert over a period of time with the purpose of perpetuating the RICO fraud. *Brown II*, 675 F.3d at 968.

### 2. Participation in the Enterprise

A RICO claim must sufficiently allege that the defendants each "conduct[ed] or participate[d], directly or indirectly, in the conduct of [an] enterprise's affairs" to establish liability under 1962(c). *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). The district court concluded that the plaintiffs had failed adequately to plead that either Coca-Cola or Dr. Drouillard sufficiently participated in the enterprise. According to the district court, the plaintiffs did not "allege non-conclusory facts to establish" that Coca-Cola and Dr. Drouillard engaged in "conduct connected to the operations or management of the enterprise," a requirement for RICO claims. *Jackson*, 2010 WL 931864, at *24.

The allegations sufficiently establish Dr. Drouillard's involvement in the enterprise for the same reasons we held that the allegations in *Brown II* sufficiently established the alleged cut-off doctor's involvement in that case. Dr. Drouillard

allegedly did more than just conduct his own affairs, as the district court held. *Id.* His "evaluations were not objective medical reports" and instead, he "allegedly fraudulently slanted his medical evaluations to serve the purposes of the enterprise." *Brown II*, 675 F.3d at 968; *see also* R. 2 (Am. Compl. at ¶¶ 12-16) (alleging Dr. Drouillard was hired to "write cut off reports" for Coca-Cola and Sedgwick by reliably "stating a claimant did not have a work-related disability whether or not such disability actually existed"). Although the allegations are that Coca-Cola and Sedgwick made the ultimate decision to deny benefits, the allegations are sufficient to establish that Dr. Drouillard participated in the operation or management of the enterprise.

Coca-Cola also participated in the enterprise. The plaintiffs alleged that personnel in Coca-Cola's worker's compensation department worked with Sedgwick falsely to administer the claims by Coca-Cola employees. *Id.* at ¶ 9. Coca-Cola also routinely used and relied on the false medical reports of cut-off doctors such as Dr. Drouillard fraudulently to terminate benefits and regularly communicated with Sedgwick "concerning the desire of Coke and Sedgwick to obtain a [cut-off] report." *Id.* at ¶ 13 (Page ID #28). Coca-Cola with others then "misrepresented" to the plaintiffs through the use of the mail that the cut-off doctors were "independent." *Id.* at ¶ 15 (Page ID #29). While many options remain regarding the scope of Coca-Cola's involvement, we do not agree with the district court that these allegations are "conclusory." *Jackson*, 2010 WL 931864, at *24. As with Dr. Drouillard, Coca-Cola need not have handled the administration of the plaintiffs' claims in order to be involved in the operational or management affairs of the enterprise. *See Brown II*, 675 F.3d at 968.

### 3. Pattern of Racketeering

To establish "a pattern of racketeering activity" under 18 U.S.C. § 1962(c), the plaintiffs must show "at a minimum, two acts of racketeering activity withing ten years of each other." *Heinrich*, 668 F.3d at 409 (citing 18 U.S.C. § 1961). The plaintiff must also show that the predicate acts "are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989)). Here, the district court held that the plaintiffs had sufficiently alleged

nine predicate acts of racketeering activity, but held that even if such acts were related, the plaintiffs failed to demonstrate a continued threat of criminal activity.

### a. Predicate Acts

The district court considered both the Amended Complaint and the Proposed Second Amended Complaint and held that the plaintiffs have alleged with sufficient particularity nine predicate acts of mail fraud. *Jackson*, 2010 WL 931864, at *27. Even if we consider just the Amended Complaint, these acts included: (1) the mailing on or about July 22, 2008, by Coca-Cola and Sedgwick of a knowingly false notice of dispute of Scharnitzke's benefits; (2) the mailing on January 6, 2009, by La Tara Lewis of Sedgwick to Jackson requesting an "independent" medical examination by Dr. Drouillard who was not in fact independent; (3) the mailing of a false medical report on or about January 14, 2009, by Dr. Drouillard to the state agency and by Sedgwick to Jackson. R. 2 (Am. Compl. ¶¶ 31A, 31B). We agree that each of these acts is alleged with sufficient particularity to constitute mail fraud under RICO. *Heinrich*, 668 F.3d at 403.

The defendants raise two arguments on appeal relating to the sufficiency of the individual predicate acts, both of which the district court declined to resolve below. *Jackson*, 2010 WL 931864, at *14 n.27. First, Dr. Drouillard argues that the plaintiffs must plead that each defendant committed two predicate acts, as opposed to the enterprise as a whole having committed at least two predicate acts. He cites no case law in support of this argument, and we have found none. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 n.2 (6th Cir. 2006) (declining to decide issue). Indeed, requiring two acts by each defendant is contrary to the instructions in *Reves* that someone can participate in an enterprise "directly or indirectly" in violation of RICO. *Reves*, 507 U.S. at 185.

Second, the defendants argue that the plaintiffs' RICO claims fail for the independent reason that the plaintiffs have failed to allege that the defendants "deceived" the plaintiffs into giving up their property rights by their actions. Coca-Cola Br. at 11, 21. The plaintiffs admit that they were not "deceived" by the actions of the defendants;

rather, they argue that a misrepresentation is not an element of mail fraud, and even if it is, they have alleged numerous misrepresentations by the defendants both to themselves and to the Board.[8] The defendants' argument appears at odds with *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), which disposed of the first-party reliance requirement in RICO claims. *Id.* at 659.[9] However, because both of these arguments were not addressed by the district court, we leave it to the district court to consider on remand whether either of the arguments has any merit.

### b. Acts are Related

The district court, without deciding the issue, indicated that "[t]he relatedness of the predicate acts alleged by Plaintiffs is a close call." *Jackson*, 2010 WL 931864, at *28. We believe the list of nine predicate acts identified by the district court are sufficiently related.

Acts are related for RICO purposes if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240.

---

[8] The plaintiffs correctly state the law on this matter. The concurrence insinuates that but for *Brown II*, the court would not be bound by the principle that one can establish a civil RICO claim without establishing the traditional elements of common-law fraud. Even without *Brown II*, however, the concurrence would remain bound by this principle given the following discussion in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008):

> First, as explained above, the predicate act here is not common-law fraud, but mail fraud. Having rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim. Reliance is not a general limitation on civil recovery in tort; it is a specialized condition that happens to have grown up with common law fraud. That specialized condition, whether characterized as an element of the claim or as a prerequisite to establishing proximate causation, simply has no place in a remedial scheme keyed to the commission of mail fraud, a statutory offense that is distinct from common-law fraud and that does not require proof of reliance.

*Id.* at 655–56 (internal quotation marks and citations omitted). It is thus unclear how this court would not be bound by this principle but for *Brown II*.

[9] The concurrence accuses the *Brown II* opinion of selectively quoting *Bridge* for the proposition that reliance is not always required in order to establish a RICO violation. Somewhat ironically, the quotation relied upon and paragraphs cited by the concurrence in making this point conveniently omit the contradictory surrounding text, including in one instance a clause in the same sentence. As any careful reader would discern, the Court in *Bridge* unequivocally determined that reliance is not necessary for a civil RICO claim: "the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action." 553 U.S. at 659 (internal quotation marks omitted).

The relationship standard is meant to be broad, not narrow. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 354 (6th Cir. 2008) ("*Brown I*"), *cert. denied*, 130 S. Ct. 795 (2009). The acts alleged here are related in the same manner as the allegations we examined in *Brown I*. At a minimum, "[t]hey have the same purpose:  to reduce [Coca-Cola's] payment obligations towards worker's compensation benefits by fraudulently denying worker's compensation benefits to which the employees are lawfully entitled." *Id.* at 355; *Moon*, 465 F.3d at 724.

### c.  Continuity

The district court concluded that despite the number of predicate acts, the plaintiffs had failed adequately to plead a pattern of racketeering because of a lack of continuity.  Continuity can be based on an open-ended or closed-ended theory.  The district court held that the plaintiffs failed to allege either. *Jackson*, 2010 WL 931864, at *30.  We disagree.

Under *H.J. Inc.*, a plaintiff shows closed-ended continuity "by proving a series of related predicates extending over a substantial period of time."  492 U.S. at 242.  In *Moon*, we held that the plaintiff had failed to allege closed-ended continuity because the only scheme alleged was the one to terminate his own worker's compensation benefits. *Moon*, 465 F.3d at 726.  We held that such a scheme was no more indicative of "long-term criminal conduct" than a single scheme relating to a single disputed contract. *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242).  In *Brown I*, on the other hand, similar allegations of worker's compensation fraud were sufficient to establish closed-ended continuity because the allegations established "a series of related predicate acts that span well over three years."  546 F.3d at 355.  Here, the pattern in the complaint more closely resembles the allegations of *Brown I* than in *Moon*.  Although each plaintiff was denied benefits individually, the denials were part of a long-term scheme to deny benefits generally during the nineteen-month period in which the predicate acts considered by the district court were committed. *Jackson*, 2010 WL 931864, at *30.

The plaintiffs have also sufficiently pleaded open-ended continuity. Open-ended continuity is "established if the related predicates themselves involve a distinct threat of

long-term racketeering activity, either implicit or explicit." *H.J. Inc.*, 492 U.S. at 242. Continuity may be shown where "'the predicates are a regular way of conducting defendant's ongoing legitimate business.'" *Brown I*, 546 F.3d at 354 (quoting *H.J. Inc.*, 492 U.S. at 243). Here, as in *Brown I*, the allegations suggest that the defendants' scheme would continue on well past the denial of any individual plaintiff's benefits. R. 2 (Am. Compl. ¶ 12-15) (Page ID #27-29). Continuity was sufficiently pleaded.

### d. Conclusion

Because the plaintiffs' complaint adequately states a claim for relief under RICO, the district court erred in granting the defendants' motion to dismiss. On remand, the parties may wish to re-seek leave to amend to conform the pleadings to any additional facts, within the discretion of the district court.

## D. RICO Conspiracy Claim

In their Proposed Second Amended Complaint, the plaintiffs attempted to add a count of RICO conspiracy under 18 U.S.C. § 1962(d). The district court determined that the plaintiffs did not unduly delay the filing of the amendments and the defendants would suffer from no prejudice if the amendments were permitted. However, the district court refused to permit amendment on the basis of futility for the same reasons it dismissed the pending claims. Because we hold that the district court erred in its analysis of the substantive elements of a RICO claim as discussed above, we leave it to the district court to decide in the first instance whether to permit the RICO conspiracy claim to go forward.

## E. Witness Immunity

Dr. Drouillard argues that he is immune from suit under the witness-immunity doctrine because he examined Jackson and offered a medical opinion. The plaintiffs' only response on appeal is that the issue was not addressed below, and this is not an exceptional case justifying our review despite that fact. We agree, and we therefore decline to express an opinion on the matter.

**F.  Motion for Reconsideration Under Rule 59(e) and for Relief From Judgment Under 60(b)(1), (2), and (6)**

Because we vacate the final order that was the subject of the plaintiffs' motion to reconsider and motion for relief from judgment, that portion of the plaintiffs' appeal is now moot. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 548 (6th Cir. 2007).

### III.  CONCLUSION

For the aforementioned reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

-----------------------------------

### CONCURRENCE IN THE JUDGMENT

-----------------------------------

ALICE M. BATCHELDER, Chief Judge, concurring. I concur in the judgment because we are bound by precedent, as the lead opinion makes clear. Lead Op. at 2, 8, citing *Brown v. Cassens Transp. Co.*, 675 F.3d 946 (6th Cir. 2012). Specifically, we are bound by a holding that says parties to a state worker's compensation program are subject to federal civil-RICO liability — to each other — because a civil-RICO plaintiff can: (1) demonstrate "mail or wire fraud" without ever showing any actual fraud, *id*. at 954 (discussing mail fraud as the "predicate offense" but omitting any suggestion that *anyone* was ever deceived by any alleged misrepresentations);[1] (2) demonstrate injury to "business or property" by alleging only personal injuries, *id*. at 965 ("When a plaintiff's personal injury is filtered through the WDCA, it is converted into a property right."); and (3) demonstrate actual damages without showing an entitlement to any benefits, *id*. at 966 ("even if a [worker's compensation claimant] cannot ultimately satisfy the criteria to receive [benefits]"). So, I must accept the outcome of today's decision, but I cannot agree that it is correct. In fact, I do not agree that civil RICO was intended for situations such as this — that is, I do not agree that Congress enacted civil RICO so that adversarial parties to a formal program of mutual and reciprocal sacrifices and benefits could subsequently repudiate their sacrifices and exact additional benefits.

---

[1]The precedent opinion, *Brown*, 675 F.3d at 952, cites *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, (2008), for the assertion "that civil RICO plaintiffs do not need to demonstrate reliance on defendants' fraudulent representations," and refers to the earlier opinion, *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 356-57 (6th Cir. 2008), which analyzed that issue. To be sure, *Bridge* holds that first-party reliance is not required, *id*. at 650-54, but it also goes on to say that "the plaintiff's loss must be a foreseeable result of *someone*'s reliance on the misrepresentation," *id*. at 656 (emphasis in the original); *see also* 658-59 ("[N]one of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." (emphasis in the original)). Neither of the *Brown* opinions points to any reliance by anyone or suggests that any showing of any reliance was ever required.

In the present case, the district court declined to reach the merits of the defendants' argument "that Plaintiffs' [sic] have failed to plead mail fraud, as Plaintiffs have not demonstrated that anyone was 'deceived' by Defendants [sic] actions." *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 09-11529, 2010 WL 931864, *14 n.27 (E.D. Mich. Mar. 11, 2010). The lead opinion here offers no indication that anyone was actually deceived by any misrepresentations, but declined to reach this argument and "will leave it to the district court to consider on remand." Lead Op. at 20.

In general, worker's compensation programs are a "social trade-off" in which employees give up the right to litigate workplace injuries in exchange for no-fault insurance coverage while employers provide no-fault coverage to avoid the risks and costs of litigation. *See generally Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 662-63 (2006). Under Michigan's Worker's Disability Compensation Act (WDCA), employees who suffer workplace injuries "*shall* be paid compensation," Mich. Comp. Laws § 418.301(1) (emphasis added), and, in exchange, they submit to the WDCA as "the employee's *exclusive* remedy," *id*. § 418.131(1) (emphasis added).

In this case, the employees want the benefit (i.e., the no fault compensation) but not the bargain (i.e., proceeding exclusively under the WDCA program). That is, they do not want to proceed exclusively under the WDCA because, they contend, the employer, the employer's claims manager, and the claims manager's hand-picked doctor are conspiring to deprive them of a fair hearing under the WDCA by having the doctor submit false medical opinions. Rather than proceed through the WDCA program,[2] these employees sought recourse in federal court, under RICO.

This idea of filing a civil RICO lawsuit against the opposing party to a worker's-compensation dispute is not new; it dates back to at least 1991, *see* Daniel Fitzpatrick, *Civil RICO and Antitrust Law: the Uneven Playing Field of the Workers' Compensation Fraud Game*, 25 Pac. L. J. 311, 335 (1994), when Zenith Insurance began to file such suits as an "anti-fraud tactic" against "worker's comp mills." The claim then was virtually a mirror image of the claim here:

> Unscrupulous lawyers often combine with medical clinics in what are known as 'workers' comp mills,' where runners and cappers are hired to recruit workers outside of factories or state employment offices and refer

---

[2] The WDCA provides for review of a disputed claim by a mediator or at a hearing before a worker's compensation magistrate, Mich. Comp. Laws § 418.847; provides for review of the magistrate's decision by the Workers Compensation Appellate Commission, § 418.859a; and provides for subsequent judicial review, § 418.861a(14).

The WDCA provides that a disability insurer must pay a penalty of $50.00 per day if, in the absence of a dispute over the claim, it fails to pay benefits within 30 days, though it limits the total penalty to $1500. § 418.801(2). The WDCA also provides that a self-insurer can lose its privilege if it "repeatedly or unreasonably fails to pay promptly claims for compensation for which it shall become liable." § 418.631(1).

them to the lawyers, who assist the workers in filing claims for compensation. The lawyer then sends these workers to doctors or psychologists who perpetuate the scheme by performing costly evaluations to justify the claims.

*Id*. at 323 (footnotes omitted). I suppose we may be entering an era when both sides to the worker's compensation dispute sue each other under RICO, with the winner prevailing on the worker's compensation dispute and obtaining RICO damages as well. I do not agree that Congress enacted RICO for this purpose and I think that the limitations on RICO claims — limitations that the lead opinion and the *Brown* precedent have painstakingly removed — were included to prevent this.

I believe that to show fraud under RICO, a plaintiff must actually allege and demonstrate some type of fraud — that is, "a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance," *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008), with the applicable third party in a worker's compensation dispute being the decision-makers. In fact, since this is an adversarial proceeding with multiple tiers of review, the plaintiff must be able to allege and show misrepresentation to, and reliance by, every decision-maker along the way: the WDCA mediator or magistrate, § 418.847; the Workers Compensation Appellate Commission, § 418.859a; and the state appellate and supreme courts, § 418.861a(14). Without *some* type of misrepresentation and reliance, there is simply no fraud. *Bridge*, 553 U.S. at 658-59.[3]

Moreover, I believe that an employee's workplace injury cannot satisfy the RICO requirement that the injury be to "business or property." A workplace injury may warrant compensation under the worker's compensation scheme, but a reduction in that

---

[3]The Supreme Court held in *Bridge* that first-party reliance was not required to prove causation under the mail-fraud statute, but clarified that *some* reliance would be necessary to show causation:

> Of course, none of this [explanation that first-party reliance is unnecessary] is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation. . . . In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause.

*Bridge*, 553 U.S. 658-59 (emphasis in original; internal citation omitted).

compensation is not an independent injury to business or property. This is explained fully in the excellent analysis provided by Judge Gibbons in her dissent from the *Brown* precedent, *see Brown*, 675 F.3d at 969-74 (Gibbons, J., dissenting), and Judge Borman in his analysis of this issue in the underlying *Brown* decision, *see Brown v. Cassens Transp. Co.*, 743 F. Supp. 2d 651, 671-74 (E.D. Mich. 2010).

And I believe that the plaintiff must show that he or she is actually entitled to benefits in order to assert any legitimate claim of damages. Again, Judge Borman in the underlying *Brown* case, *Brown* 743 F. Supp. 2d at 674-76, and Judge Edmunds in the present case, *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 09-11529, 2010 WL 931864, *20-22 (E.D. Mich. Mar. 11, 2010), have thoroughly and correctly analyzed this issue, particularly given that it would fall on them to particularize these presumed damages. I will merely note my additional disagreement with two aspects of the *Brown* precedent. First, I do not agree that claims of misrepresentation by an opposing party in an adversarial proceeding equate to a claim of legal malpractice by one's own attorney. *See Brown*, 675 F.3d at 966. In the legal-malpractice situation, the attorney's malpractice denies the client the opportunity to fully present her claim in the adversarial proceeding. In the present case, however, the client (and her attorney) get the full benefit of the adversarial proceeding — to the extent that the employer's doctor's medical report was untrue, the employee could provide her own doctors' competing report(s), she could testify that the employer's report was untrue, her attorney could challenge the employer's report, the employer's doctor, and the employer himself. In this situation, an employee who settled or lost has already had the full benefit of an adversarial proceeding (with multiple tiers of review); she is not entitled to another "suit within a suit."

Similarly, I do not agree with the insinuation that settling the claim necessarily demonstrates that the employee was entitled to at least *some* benefits, or that the settlement value is the starting point for how much she "would have" received. *See Brown*, 675 F.3d at 966-67. Parties settle for all manner of reasons. I do not agree that settlement is evidence that the claims were valid.

Thus, abiding by our precedent in *Brown*, I concur in the judgment in this case, though I disagree with the reasoning of that precedent and its application here.